**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GRANDER HOLDINGS, INC., GRANDER
HOLDINGS, INC. 401K PSP,  BRAUSER
FAMILY TRUST 2008, MICHAEL BRAUSER,
DANIEL BRAUSER, BENJAMIN BRAUSER,
GREGORY BRAUSER, and JOSHUA
BRAUSER,

                    Plaintiffs,

      v.

JOHN DAVID HANSEN and GREGORY P.
HANSON,

                Defendants.

Case No.: 1:20-cv-8618-AKH

**DECLARATION OF JUSTIN B.
KAPLAN**

## <u>DECLARATION OF JUSTIN KAPLAN</u>

I, Justin Kaplan, hereby declare as follows:

1.      I give this testimony based on my first-hand knowledge of the facts stated herein. I am over the age of eighteen; I am otherwise competent to make this declaration.

2.      I am counsel of record for Grander Holdings, Inc., Grander Holdings, Inc. 401k PSP, Brauser Family Trust 2008, Michael Brauser, Daniel Brauser, Benjamin Brauser, Gregory Brauser, and Joshua Brauser ("Grander Plaintiffs").

3.      Attached hereto as Exhibit "A" is a copy of the Grander Plaintiffs' Proposed Sixth Amended Complaint ("PSAC").

4.      Attached hereto as Exhibit "B" is a document showing changes in redline between the Grander Plaintiffs' Fifth Amended Complaint and the PSAC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 25, 2022.

__/s Justin Kaplan_____

__    JUSTIN KAPLAN

2

# EXHIBIT "A"

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRANDER HOLDINGS, INC., GRANDER HOLDINGS, INC. 401K PSP, BRAUSER FAMILY TRUST 2008, MICHAEL BRAUSER, DANIEL BRAUSER, BENJAMIN BRAUSER, GREGORY BRAUSER, and JOSHUA BRAUSER, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN DAVID HANSEN and GREGORY P. HANSON, <br><br> Defendants. | Case No.: 1:20-cv-8618-AKH <br><br> **[PROPOSED] SIXTH AMENDED COMPLAINT** |

Plaintiffs, Grander Holdings, Inc. ("Grander Holdings"), Grander Holdings, Inc. 401k PSP ("Grander Holdings 401K"), Brauser Family Trust 2008 ("Brauser Family Trust"), Michael Brauser ("M. Brauser"), Daniel Brauser ("D. Brauser"), Benjamin Brauser ("B. Brauser"), Gregory Brauser ("G. Brauser"), and Joshua Brauser ("J. Brauser") (collectively "Plaintiffs"), by and through undersigned counsel, sue Defendants, John David Hansen ("Hansen") and Gregory P. Hanson ("Hanson")(collectively, the "Defendants"), and allege:

**<u>JURISDICTION, VENUE, AND PARTIES</u>**

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and more than $75,000 is at issue, exclusive of interest, costs and fees.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

3.      Personal jurisdiction over Defendants exists because Defendants regularly engaged in business and transacted business in New York, as discussed below, and because Defendants have consented to personal jurisdiction in New York.

4.      Numerous investment documents, including the August 11, 2017, Securities Purchase Agreement and April 27, 2018, Securities Purchase Agreement, among others, signed by the Plaintiffs in connection with the investments at issue state, in sum or substance:

> Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

5.      Several of the investment documents signed by the Plaintiffs make clear that this forum-selection clause applies to claims "whether brought against a party hereto or its respective affiliates, directors, officers, shareholders, partners, members, employees or agents," which includes Defendants.

6.      During the relevant period, Defendants spoke with M. Brauser or other investors including without limitation Barry Honig ("Honig") in New York and elsewhere, who Defendants knew to be relaying such communications to other investors including the Plaintiffs on several occasions to solicit investments that are at issue in this action. In addition to simply having knowledge of the foregoing, Defendants intended that same occur and knew or should have known that Plaintiffs would rely upon them when deciding whether to invest in MabVax.

7.      The claims alleged herein arise from the investment documents making clear that New York is the appropriate forum, and the causes of action arise in part from these solicitations, which took place in New York. Moreover, MabVax, at Defendants' direction, regularly transacted business in New York, and entered into agreements with entities in New York, including with Cold Spring Harbor Laboratory, a nonprofit New York State education corporation, and Y-mAbs Therapeutics, Inc., which has a principal place of business in New York, New York. Also, an

2

investigative site for MabVax's clinical trials was Memorial Sloan Kettering Cancer Center in New York City.

8.      Plaintiff, Grander Holdings, is a company that was incorporated and exists under the laws of the State of Florida with its principal place of business located in Palm Beach County, Florida. Michael Brauser has at all times material been its President; and Grander Holdings is the Plan Administrator for the Grander Holdings 401K PSP.

9.      Plaintiff, Brauser Family Trust, is an irrevocable trust formed under the laws of the State of Florida. B. Brauser has at all times material been its Trustee; and he continues to be its Trustee. As B. Brauser brings this action as the Trustee of the Brauser Family Trust, he does so as a citizen of the State of Florida.

10.     Plaintiff, M. Brauser, is a citizen of Broward County, Florida.

11.     Plaintiff, D. Brauser, is a citizen of Broward County, Florida.

12.     Plaintiff, B. Brauser, is a citizen and resident of Palm Beach County, Florida.

13.     Plaintiff, G. Brauser, is a resident of Palm Beach County, Florida.

14.     Plaintiff, J. Brauser, is a resident of Palm Beach County, Florida.

15.     Defendant, John David Hansen, was, at all relevant times, President, CEO, and Chairman of the Board of Directors of MabVax. Hansen signed many of MabVax's public filings. He is domiciled in California and on information and belief, was in California at all times material when Plaintiffs agreed to purchase all securities identified herein. Hansen personally solicited the one or more of the Plaintiffs, within and outside of California, on multiple occasions to make investments into the company. Hansen also had personal knowledge of all the relevant material non-public information, was responsible for public disclosures, and otherwise had control over MabVax's actions alleged herein.

3

16. Defendant, Gregory P. Hanson, was, at all relevant times, the Chief Financial Officer ("CFO") of MabVax. Hanson also signed many of the SEC filings described below and he was the MabVax officer who primarily corresponded by phone and email with Plaintiffs, including without limitation concerning the Series M and N Financings, and otherwise had control over MabVax's actions alleged herein. He is domiciled in California, and on information and belief, was in California at all times material when Plaintiffs agreed to purchase all securities identified herein.

## GENERAL ALLEGATIONS

### A. Introduction.

17. MabVax was originally incorporated in Delaware in 1988 under the name Terrapin Diagnostics, Inc. It was renamed Telik, Inc., ten years later; and it again changed its name to MabVax in September 2014 as a result of a merger with MabVax Therapeutics, Inc. As a Delaware company, it and its officers, including the Defendants, were subject to the fiduciary provisions of the Delaware General Corporate Law.

18. Because MabVax was always a publicly traded company material to the claims alleged herein, it regularly made public filings to the SEC. Plaintiffs regularly relied on those public filings, which Hansen and Hanson had signed in California. As executives of a publicly traded company, Defendants knew or should have known that investors such as Plaintiffs would rely on MabVax's public filings.

19. From and throughout 2014 through 2018, MabVax regularly described itself in public documents as a "clinical-stage biotechnology company focused on the development of antibody-based products and vaccines to address unmet medical needs in the treatment of cancer."

20. At all times material, it was primarily focused on developing a human monoclonal

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

antibody to treat pancreatic cancer. Its "lead" antibody program concerned the HuMab-51 antibody (also known as "MVT-5873"). The HuMab-51 antibody is of human origin and was discovered as a result of the immune response to an antigen-specific vaccine administered to cancer patients.

21.     MabVax took the position at all times material that it "cannot earn product revenue until it (or its collaborative partners) complete clinical trials, obtain regulatory approval, and successfully commercialize one or more of its products.  As a result, the company has incurred, and will likely incur, substantial operating losses." Consistent with its public statements, MabVax never developed a product to sell and never had more than minimal revenue.

22.     At all times material, MabVax further stated that "to continue its vitally important work, MabVax has raised, and if it can carry on, will have to continue to raise money through debt and equity financing."

23.     Plaintiffs collectively invested more $3,100,000 in MabVax between August 2016 and 2018.

24.     MabVax's employee headcount dwindled from sixteen to six throughout 2017 and 2018, with Defendants at all times material the principal two remaining employees. Considering its diminutive size, Defendants were intimately familiar with MabVax's operations, including the status of its important clinical trials and the issuance of information to the public regarding same.

25.     As is often the case, Plaintiffs invested in a company (MabVax) that operated in a field in which they were not experts. Because of this, among other reasons, Defendants knew that investors including Plaintiffs would and did rely on the company's public filings, the views of sophisticated institutional investors, and statements of the company's officers and directors

(including Defendants); and that Plaintiffs would expect those public filings, views, and statements, to be complete and truthful.

26.     When Plaintiffs invested in MabVax, they did so believing that the investments would be used to—as MabVax puts it— "continue its vitally important work."

27.     Instead, Hansen, as MabVax's President and Chief Executive Officer, and Hanson, as its Chief Financial Officer, knowingly and willingly mislead Plaintiffs to secure and retain Plaintiff's investments largely to support and sustain Defendants' own excessive compensation. In so doing, they received millions of Dollars ostensibly to bring a promising cancer treatment to market while instead primarily lining their own pockets. For example, during the relevant time period, Defendants' total combined compensation including salary, equity grants, and other benefits was over $5,200,000[1]—vastly more than the average compensation for similarly-situated executives of early-stage companies, and much more reflective of companies in the Russell 2000 with assets between 10 and 125 times the amount of MabVax.[2]

28.     In order to fund their outsized salaries and to fund MabVax's development efforts, it was imperative that Defendants and MabVax continually obtain financing from outside investors, including Plaintiffs. From 2016 to 2018, Hansen and Hanson duped the Plaintiffs into making investments into MabVax by knowingly and intentionally making material misrepresentations and omissions that Plaintiffs relied upon in connection with investment

---

[1] In 2016, Hansen caused MabVax to compensate him $989,257 ($418,438 salary, $141,400 bonus, $393,702 options, $35,717 "other comp"). In 2017, he caused MabVax to compensate him $2,165,915 ($427,876 salary, $448,500 in stock, $1,252,905 options, $36,634 "other comp"); and in 2018, Hansen caused MabVax to pay him a salary of $430,000. In 2016, Hanson caused MabVax to compensate him $453,602 ($276,014 salary, $62,790 bonus, $99,743 options, $15,055 "other comp"). Hanson similarly caused MabVax to compensate him $848,201 ($309,312 salary, $277,016 stock, $224,945 options, $36,928 "other comp") in 2016 and a salary of $317,386 in 2018.

[2] For example, in "The BDO 600", a 2016 survey of CEO and CFO compensation practices, BDO found that the average compensation paid to CEOs of companies with $100M to $500M revenues and $1.25B in assets was $2,324,230 in 2015, similar to Hansen's 2017 total compensation of $2,165,915. For CFOs, BDO found the average total compensation was $964,824, similar to Hanson's 2017 total compensation of $848,201. Of course, MabVax's

NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

decisions and the subject of which caused Plaintiffs' economic loss.

29.     Specifically, Defendants repeatedly lied to Plaintiffs and other investors about the interim results and progress of MabVax's Phase I clinical trial of its lead therapeutic antibody, HuMab-B1 (also referred to as "MVT-5873"), generally, and specifically the high level of "adverse events" clinical patients suffered.

**B.  The Phase 1 Clinical Trial.**

30.     MabVax initiated the "Phase I clinical trial" for the HuMab-B1 antibody therapy in February 2016. It was required to and did so to establish the safety of, and patient tolerability to MabVax's antibody.

31.     MabVax hoped to achieve those goals by conducting a two-part phase I clinical trial. In the first part, described by the Defendants as both "Phase 1a" and the "Monotherapy trial," MabVax administered the antibody to three-person groups of patients to identify a safe "Maximum Tolerable Dose." "Maximum Tolerable Dose" is defined in medical literature as the highest dose of a drug or therapy that does not cause unacceptable side effects or toxicity.

32.     Determining the Maximum Tolerable Dose was achieved by progressively increasing the dosage for each cohort until Dose Limiting Toxicities were noted (i.e. side effects from the treatment that are serious enough to deter addition dosage increases). Clinical trials typically determine a "Maximum Tolerable Dose" as being the dose level immediately below the Dose Limiting Toxicity.

33.     In the second part of the Clinical Trial, described by the Defendants as both "Phase 1b" and the "Combination Trial," cohorts of patients were administered the Maximum Tolerable Dose of the HuMab-5B1/MVT-5873 antibody together with the standard of care (i.e. medically standard) chemotherapy treatment (nab-paclitaxel and gemcitabine) in order to

revenues and assets were nowhere close to $100M.     7

determine safety and tolerability.[3]

34.    MabVax's antibody treatment had safety problems from the beginning. Patients encountered a materially large number of adverse events—many "severe" adverse events. An "Adverse Event" is an unexpected negative medical occurrence associated with the use of a drug in humans. A "Severe Adverse Event" is an adverse event that is evaluated as Grade 3 or higher under the Common Terminology Criteria for Adverse Events ("CTCAE"), published by the United States Department of Health and Human Services.

35.    The Adverse Events that presented during the late spring and early summer of 2016 which led to dose-limiting toxicities at most dosage levels administered to patients, which alone precluded calling MabVax's therapy drug at that dose "safe" or "well-tolerated."

36.    Thirty-two patients participated in Phase 1a of MabVax's Clinical Trial; and they collectively encountered 172 Adverse Events, including without limitation liver damage, anemia, hyperglycemia, and several other material side effects. At least twenty-seven of those Adverse Events were graded "Grade 3 – Severe" or "Grade 4 – Life-Threatening."  At least nine patients (nearly 1/3 of all patients) reached Dose Limiting Toxicity that required reducing or delaying their doses or discontinuing their treatment altogether.

37.    Defendants did not disclose to Plaintiffs and other investors the high prevalence of Severe Adverse Events (Grade 3) or Life-threatening Events (Grade 4) encountered by patients during the Phase 1a part of the Clinical Trial during 2016 and 2017—all while actively and personally pursuing investments from Plaintiffs. They instead concealed that negative information from investors and issued numerous false and misleading press releases and SEC filings which represented that interim results of Phase 1a of the Clinical Trial were **"positive"**

---

[3] Plaintiffs will collectively refer to the two parts of the trial as the "Clinical Trial."

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

and that **"safety was established"** to induce Plaintiffs and others to purchase millions of dollars of MabVax securities.

38.     MabVax commenced the second part of its clinical trial in November 2016 where the HuMab-5B1/MVT-5873 antibody was administered to patients in combination with the standard of care chemotherapy even though it had not yet established the Maximum Tolerated Dose of its antibody therapy and would not do so until the second quarter of 2017.

39.     The initial results in that "Phase 1b" or "Combination Trial" demonstrated even greater toxicity than the results from Phase 1a. Between late 2016 and early January 2017, the first three patients encountered a massive number of adverse events (24 in total) shortly after starting treatment. Seven of those Adverse Events were graded Grade 3 (Severe) or Grade 4 (Life Threatening)—most occurring within days of the commencement.

40.     The Adverse Events were so bad that the treatment of all three patients in the first patient-grouping was discontinued almost immediately after beginning. MabVax reduced the dosage of its antibody therapy administered to subsequent patients by a factor of eight in an attempt to protect the next cohort of patients from Severe Adverse Events.

41.     Reducing the dosage by such a large margin in the second cohort of the Phase 1b trial did not alleviate the safety problems, however. In early 2017, two of the first three patients treated with the reduced dosage in the combination trial (Phase 1b) developed Grade 3 (Severe) pneumonitis, an inflammation of lung tissue that had the potential to cause irreversible lung damage. Two more patients in a later patient grouping developed Grade 3 (Severe) and Grade 4 (Life Threatening) pneumonitis, causing MabVax to completely shut down its Clinical Trial.

42.     Though nearly all the initial cohorts of patients in the Phase 1b Combination Trial had suffered severe or in some cases life-threatening Adverse Events by the beginning of June

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

2017—which Defendants knew of—Defendants concealed those facts from Plaintiffs and other investors. They instead repeatedly touted in press releases and SEC filings throughout 2017 and 2018 that MabVax's antibody treatment was "well tolerated" by patients and that interim results were "positive" and "promising."

43.     Defendants knowingly and willfully misled the Plaintiffs about the interim results and progress of the Clinical Trial specifically to induce them to invest millions of Dollars into MabVax to keep it financially afloat and sustain Defendants' excessive compensation. From August 2017 to May 2018, Plaintiffs invested $3,154,700 in MabVax based upon and in reliance upon Defendants' material misrepresentations and omissions concerning the Clinical Trial.

44.     Even after MabVax was forced in 2018 to shut down the Clinical Trial due to the high prevalence of Severe Adverse Events patients repeatedly suffered, Defendants did not disclose it for months while they continued to (successfully) solicit further investment from Plaintiffs and others.

45.     When Defendants finally disclosed that fact in October 2018, they tried to hide the news by including a single sentence appearing on page 30 of a Quarterly Report that was belatedly filed with the SEC five months late—indicating that Defendants were aware of how troublesome this development was. This was in stark contrast to Defendants' and MabVax's prior (and consistently) misleading statements and public filings signed by Defendants that touted the results of the Clinical Trial as "positive" that they highlighted in numerous stand-alone press releases.

46.     Following that disclosure, MabVax was unable to raise any material financing, and within less than six months it filed for bankruptcy.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

**C. Defendants Made Material Misrepresentations and Omissions Concerning Progress of MabVax's Phase 1 HUMab-5B1 Antibody Clinical Trial.**

*1. MabVax Required Continual Outside Financing.*

47.     MabVax was a clinical stage company that had minimal revenue, but maximum expenses. It required continual financing to remain a going concern until its therapy was either sold or licensed to other companies, or until it otherwise progressed through three stages of clinical trials until approved by the FDA so that it could reach the consumer market. If MabVax ran out of financing, it would cease to exist. Defendants were always acutely aware of this reality.

48.     According to MabVax's Annual Report for the year ended December 31, 2015, at the end of 2015 the Company only had approximately $4 million of cash and cash equivalents on hand. In 2015, the Company had total operating expenses over $19 million, as well as reported that it expected to continue losing money for "at least the next several years" and was dependent on raising additional financing to fund operations. MabVax's own independent auditor stated in its March 14, 2016 audit report that those "conditions raise substantial doubt about the Company's ability to continue as a going concern."

49.     It was therefore critical that Defendants issue a consistent stream of "good news" about MabVax's efforts in order to successfully solicit additional necessary investment to fund MabVax and Defendants' exorbitant salaries.

*2. The Importance of HuMab-5B1/MVT-5873 to MabVax's Viability.*

50.     MabVax's HuMab-5B1/MVT-5873 antibody therapy was at the center of its and Defendants' campaign to attract investors, including Plaintiffs.

51.     On July 31, 2015, MabVax referred to it as its "lead antibody development program." MabVax public filings between May and August 2016 stated that MabVax was

"substantially dependent on the success of our product candidates, HuMab-5B1 and 89ZR-HuMab-5B1."

52.     Defendants kept themselves constantly informed about the current status of MabVax's HuMab-5B1/MVT-5873 and repeatedly issued statements concerning the Clinical Trial (many of which were misleading). From early 2016 until mid-2018, for example, Hansen participated in meetings every other week during which the status of each patient in the Clinical Trial was discussed in detail with the treating doctors.

53.     Because the HuMab-5B1/MVT-5873 therapy was MabVax's "lead antibody development program," Defendants knew that the Clinical Trial's results were material to investors, including the Plaintiffs. MabVax's and Defendants' consistent release of updates regarding the Clinical Trial while soliciting necessary investments to stay afloat show Defendants' knowledge regarding its materiality to investors, as Phase 1 results directly went to MabVax's ability to continue as a going concern. The success or failure of the Phase 1 trial was therefore paramount to MabVax's success, and any negative results were absolutely material to all investors, including Plaintiffs. Without being able to tout positive Phase 1 data, MabVax would be unable to solicit future investment because it would essentially mean that MabVax would never have a viable product.

54.     As Hansen publicly acknowledged, any results, including interim results, from the Clinical Trial were material to investors, including Plaintiffs. In an interview with "Stock News Now" on August 22, 2016, which was published on YouTube on September 6, 2016, Hansen stated the following regarding early interim results of the Clinical Trial:

> But we also thought that it was important to give patients and investors and potential partners an early glimpse into what we're seeing, provided that we're seeing something substantial and important, something that we can look back on and say, "yes we validated that". And so we're looking for, somewhere in the third

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

quarter of this year, so not very far away, probably in the month of September, we think we'll have enough patients enrolled in each of those trials to say something about where we are and where we're headed, and *we think those will be a very important sort of interim milestone*. (emphasis added)

55.    Defendants knew that although the Phase 1 results were material to both ordinary investors like Plaintiffs as well as and medically sophisticated investors, ordinary investors such as Plaintiffs had no basis, other than MabVax's routine positive reporting, to understand whether these results were promising or catastrophic to MabVax's future.

56.    They accordingly knew that Plaintiffs relied on Defendants' public statements when determining whether the Clinical Trial results were promising to MabVax's future and that Plaintiffs' continuing faith in and willingness to invest in MabVax, was predicated on Defendants' representations that the interim results indicated the treatment was "safe" and "promising," and were indicative of the future health and profitability of MabVax. It was clear that negative results of the Clinical Trial would cause significant financial hardship for MabVax.

    3.   *MabVax's Disastrous Clinical Trial.*

57.    On December 1, 2015, Defendants, from and in California, caused MabVax from California to file a Form 8-K with the SEC, which attached a MabVax press release from the same day. In them, they announced that MabVax had filed an Investigational New Drug Application ("IND") with the U.S. Food and Drug Administration ("FDA") for the HuMab-5B1/MVT-5873 antibody as a therapeutic agent. They stated therein that, subject to FDA acceptance, MabVax planned to initiate its Clinical Trial early in 2016, with Phase I proceeding in two parts:

> The planned Phase I trial will evaluate the safety, tolerability and pharmacokinetics of HuMab 5B1 as a single agent or in combination with the current standard of care chemotherapy regimen in subjects with metastatic pancreatic cancer.  The first cohort of patients to be enrolled in the planned clinical trial will be enrolled in a traditional dose escalation regimen to assess safety and determine the optimal dose

13

of the antibody. A second patient cohort will establish the safety and optimized dose of the antibody when administered with standard of care chemotherapy.

58.     The December 1, 2015, press release included a quote from Hansen in which he described the filing of the IND as "a significant achievement for MabVax.  Pending FDA acceptance of the IND, we will begin the dose escalation portion of this Phase I trial as early in 2016 as possible and anticipate reporting on the early safety assessment and determination of a Maximum Tolerated Dose in mid-year 2016. Achievement of this important interim milestone will enable us to move into the combination therapy and monotherapy portions of the trial where we could learn much more about the pharmacological effects of this new therapy."

59.     On January 4, 2016, Defendants, in and from California, caused MabVax from California to issue a press release announcing that it had received notice from the FDA authorizing initiation of the Clinical trial.

60.     On March 21, 2016, Defendants, in and from California, caused MabVax from California to issue a press release from its headquarters in California announcing that the initiation of the Clinical Trial. The press release announced the primary objectives of Clinical Trial was "to determine the safety, maximum tolerated dose (MTD), and the pharmacokinetics (PK) of HuMab-5B1."

61.     The first part of the Clinical Trial (Phase 1a) was designed to determine the Maximum Tolerable Dose for administration of the HuMab-5B1/MVT-5873 antibody standing alone. To accomplish this, the initial protocol for Phase 1a required groups of three patients each to be dosed at increasing levels of the antibody (*e.g.,* 1mg per kg, then 2 mg per kg, then 3 mg per kg, etc.). Patients were monitored weekly for adverse effects. If Dose Limiting Toxicities were observed such as elevated liver function, that patient's dose would be reduced, his or her treatment would be delayed, or treatment would be discontinued.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

62.     The first two cohorts of three patients each (identified by MabVax collectively as cohort "A1") began treatment with the antibody at the dosage level of 1 mg per kg in February and March 2016.

63.     A subsequent cohort of three patients (cohort "A2") began treatment with the antibody at the dosage level of 3 mg per kg in April and May 2016.

64.     MabVax's treatment caused a materially-large number of these patients to experience adverse events almost immediately, including elevated liver function, hyperglycemia, hypoalbuminemia, anemia, vomiting and nausea. The nine patients enrolled in cohorts A1 and A2 encountered forty-four recorded Adverse Events.[4]

65.      Even worse, on information and belief, at least five of the initial nine patients (more than half) encountered Adverse Events that were diagnosed as "Grade 3."  Under the CTCAE published by the US Department of Health and Human Services and utilized throughout the U.S. medical system, an Adverse Event is to be graded as "Grade 3" when it is "Severe or medically significant but not immediately life-threatening [or] hospitalization or prolongation of hospitalization indicated [or] disabling." An Adverse Event is to be graded as "Grade 4," when the Adverse Event presents "life-threatening consequences" indicating the need for "urgent intervention."

66.     As the dosage of antibody administered to patients increased during 2016, the number of Adverse Events patients suffered also increased.

67.     The six patients in Cohort "A5" who were administered antibody at the dosage of 2 mg per kg encountered twenty-five Adverse Events, with nine of those events graded as "Grade 3 – Severe." The six patients in Cohort "A6" who were administered antibody at the

---

[4] The adverse event data was reported in documentation that MabVax sent to a potential strategic partner it was pursuing during 2017.

NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

dosage of 3.0 mg per kg faced thirty-one Adverse Events, with five of them graded as "Grade 3 – Severe."

68.     The five patients in Cohort "A7" who were administered antibody at the dosage of 2.5 mg per kg faced forty-nine Adverse Events, ten of which were graded as either "Grade 3 - Severe," and "Grade 4 – Life Threatening."

69.     The six patients in Cohort "A6" who were administered antibody at the dosage of 3.0 mg per kg suffered thirty-one Adverse Events, with five of those events graded as "Grade 3 – Severe."

70.     In other words, MabVax's "lead antibody program" was not by any means safe for human administration.

71.     Throughout 2016 and into 2017, neither the Defendants nor MabVax disclosed to investors including Plaintiffs the prevalence of Adverse Events—including Severe and Life-Threatening Adverse Events—that patients enrolled in the Clinical Trial were suffering. As detailed below, Defendants instead repeatedly made affirmative misstatements that the treatment was "safe" and "well tolerated" by patients.

72.     The 32 patients who completed the initial dose-escalation/monotherapy portion of the Phase I trial encountered 172 Adverse Events. 31 of those events graded as Severe or Life-Threatening Adverse Events. In addition to Dose Limiting Toxicities, roughly half of the patients enrolled in Phase 1a encountered at least one Severe or Life-Threatening Adverse Event. Even among the patients who received the lowest antibody dosage of 1 mg/kg, twenty-five percent suffered a Severe Adverse Event. Defendants disclosed none of this data, and instead continued to affirmatively misrepresent that the treatment was "safe" and "well tolerated" by patients.

73.     Worse was the undisclosed number of patients with suspected Hy's Law cases.

16

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

Hy's Law provides that severity of liver injury can be determined following administration of a drug.  This parameter is extensively monitored in clinical trials, including MabVax's, and post approval to prevent acute liver failure and death from liver failure.

74.     As the FDA's Guidance on Drug Induced Liver Injury provides: "[F]inding one Hy's Law case is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe liver injury when given to a larger population."[5]

75.     This FDA guidance usually pertains to large clinical trials involving hundreds to thousands of patients. It references a trial where two cases of Hy's Law in approximately 1,000 exposures caused the drug to not be approved. The prevalence of Hy's Law in patients in MabVax's Clinical Trial were, by comparison, many multiples higher: seven suspected cases of Hy's Law in just thirty-eight patients.

76.     In late spring or early summer 2016, 2 of the 3 patients in the 3mg per kg cohort of the initial dose-escalation/monotherapy clinical trial had experienced Severe Adverse Events, of which Defendants were aware.

77.     It was not until a June 5, 2017, press release that MabVax publically stated it had determined that the Maximum Tolerable Dose for its antibody in humans was 1mg per kg. "Maximum Tolerable Dose" is defined in medical literature as the highest dose of a drug or therapy that does not cause unacceptable side effects or toxicity.

78.     Well before the Phase 1a dose-escalation portion of the Clinical Trial was completed, however, and before the Maximum Tolerable Dose was determined, Defendants caused MabVax to rush out a press release boasting of "Interim Safety and Imaging Results" from the Clinical Trial.

---

[5] *Guidance for Industry Drug-Induced Liver Injury: Premarketing Clinical Evaluation*. US Food and Drug Administration (2009), at p. 5. Available at https://www.fda.gov/media/116737/download

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

79.     In November 2016, MabVax had obtained data on only half the patients who ultimately would complete the Phase 1a portion of the Clinical Trial.

80.     Despite Phase 1a of the Clinical trial being far from completed, on November 14, 2016, Defendants caused MabVax to issue a press release from its headquarters in California that was filed as an exhibit to a Form 8-K with the SEC boasting of "Interim Safety Results" from the Clinical Trial. Its headline stated: "Sufficient safety established to initiate the evaluation of MVT-5873 as a front-line therapy in combination with a standard of care chemotherapy." The press release further stated:

> The MVT-5873 phase I clinical trial initiated in February 2016 is designed to establish safety and determine the recommended phase II dose (RP2D) for MVT-5873 as both as monotherapy (Part 1 of the trial), and in combination with standard of care chemotherapy (Part 2) using nab-paclitaxel plus gemcitabine. Initiation of Part 2 requires establishing three safe dose levels for MVT-5873 as monotherapy in patients with relapsed or refractory locally advanced or metastatic pancreatic cancer. The Company reports that the safety of MVT-5873 has been established at three incremental dose levels by treating 16 patients at three clinical sites. While patients continue to be recruited to establish the RP2D, the Company also reports that Part 2 of the clinical trial is now open and will include patients with previously untreated pancreatic cancer receiving a standard of care chemotherapy as defined in the protocol.
>
> To date, the study has consented 28 subjects with 3 in screening, 9 screen failures, and 16 subjects treated. . . .

81.     The November 14, 2016, press release was materially false and misleading. While it is correct that as of November 14, 2016, MabVax had indeed dosed patients at three incremental dose levels (1mg per kg, 2 mg per kg, and 3 mg per kg) the treatment was not "safe" when administered at all those dosage levels. Only the lowest dose did not lead to dose-limiting toxicities requiring reduced dosing, delayed dosing, or discontinuation of therapy. And even at that dose, numerous adverse events were noted including five Grade 3 Severe Adverse Events.

82.     Dosage at the higher levels caused a materially large number of Severe or Life-

Threatening Adverse Events in patients. MabVax itself conceded (but not until June 5, 2017) that 1 mg per kg was the Maximum Tolerable Dose of its HuMab-5B1/MVT-5873 antibody therapy. Given the large number of Severe Adverse Events associated with higher doses, any dose higher than 1 mg/kg was clearly unsafe and Defendants knew that to be the case.

83.     Defendants also caused MabVax to announce in the same November 14, 2016, press release that based on the results from the incomplete dose-escalation phase of the trial, MabVax had opened the Phase 1b "Combination Therapy" portion of the trial, where its antibody would be administered along with standard of care chemotherapy.

84.     The early results from the Combination Trial were even worse than the prior phase. The first cohort of the Combination Trial enrolled three patients, who commenced treatment from mid-November to mid-December 2016. All three encountered a materially large number of Adverse Events; twenty-one in total, four of which were Grade 3 (severe) and one Grade 4 (life threatening). The Severe Adverse Events principally involved elevated liver function. These patients' elevated liver function tests remained high for several weeks; they did not "resolve in days" as MabVax later claimed.

85.     Two of the three initial patients in the Combination Trial were at high risk of a fatal drug-induced liver injury in accordance with Hy's Law.

86.     Numerous studies have shown that the incidence of Grade 3 or worse liver injury in patients treated with gemcitabine and nab-paclitaxel alone is less than 5%. By comparison, in the first cohort of patients who were administered gemcitabine and nab-paclitaxel in combination with MabVax's antibody, the incidence of Grade 3 liver injury *was 100%!*

87.     In short, the combination of MabVax's antibody with the gemcitabine and nab-paclitaxel chemotherapy standard of care was highly toxic to the first three patients. They all

19

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

were pulled out of the treatment within a matter of weeks and by February 7, 2017, at the latest.

88.     Based on the results of the first cohort in the Combination Trial, the doctors treating patients decided to reduce the dosage of antibody administered to the second cohort of the Combination Trial *eightfold*. Specifically, dosage was reduced from 1 mg per kg to 0.125 mg per kg—a miniscule does that may not have even been efficacious.

89.     Both Defendants were aware in early 2017 about the initial poor results of the Combination Trial and the decision to drastically reduce the dosage of antibody provided to subsequent patients due to the prevalence of Severe Adverse Events.

90.     The substantial reduction in antibody dose for patients in the Combination Trial began in early January 2017. Defendants failed to disclose that material fact for almost ten months all while continually soliciting further investment from Plaintiffs. In fact, the first mention of it was in an October 31, 2017, press release that omitted to mention that the dosage noted had been reduced from 1.0 to 0.125 and similarly omitted that the reason for the massive reduction was due to the serious liver toxicity encountered by the first three patients.

91.     The second three-patient group in the Phase 1b Combination Trial commenced treatment (at the much lower dosage level) on January 16, March 29 and May 8, 2017.  While instances of elevated liver function was reduced, two of these three patients nonetheless developed a pneumonitis prior to June 2017, both at a "Grade 3 – Severe" level. Pneumonitis is the inflammation of lung tissue that has the potential to cause irreversible lung damage. Treatment of all three patients in the second cohort of the Combination Trial was completed on or before June 7, 2017.

92.     Thus: Of the first six patients who participated in the Combination Trial, the first three all encountered severe liver toxicity, requiring delay or discontinuation of their treatment.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

The second three were treated with a drastically reduced dosage of the antibody; but despite that precaution, two of them encountered Grade 3 pneumonitis. Most if not all of those Severe Adverse Events were encountered by May 2017 and were known by Defendants.

93.     Despite knowing that five of the first six patients in the Phase 1b Combination Trial (83%) had encountered Grade 3 or 4 Adverse Events, the Defendants nonetheless caused MabVax to issue multiple public statements announcing that the results for the first six patients in the Combination Trial were "positive" and "promising, as well as that the treatment was "safe," and "generally well tolerated." That patients had to discontinue therapy and receive intervention negates the possibility that treatment was "well tolerated."

94.     MabVax did not enroll any additional patients in the Clinical Trial until in late 2017.

95.     MabVax's financial situation in 2017 and 2018 and its continued viability were uncertain without raising additional capital. Had MabVax not obtained outside funding from Plaintiffs, it would have collapsed, and Defendants likely would have lost their jobs (and their exorbitant compensation packages also).

96.     In 2017, while MabVax's ability to continue as a going concern was continually up in the air and the Clinical Trial was producing horrific results regarding safety, Defendants used shareholders' money, including Plaintiffs', to cause MabVax to compensate them over $3 million in salary, bonus, equity, and other compensation.

97.     MabVax would not have had the funds to pay Defendants this exorbitant compensation had it and Defendants not withheld material information to induce Plaintiffs to make investments during 2017.

98.     The material misrepresentations and omissions did not end there.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

99.     According to sworn testimony by defendant Hansen, in "early 2018" a third participant in the Clinical Trial developed pneumonitis. MabVax's former Vice President of Pharmaceutical Development, Paul Maffuid, has testified under oath that this third incidence of pneumonitis was so "serious" in nature that MabVax had to notify the FDA and MabVax was forced to revise the enrollment bulletin sent to doctors considering enrolling patients in the Clinical Trial. Neither Defendants nor MabVax disclosed those facts to Plaintiffs or other investors, however.

100.     A *fourth* participant in the Clinical Trial also developed pneumonitis. MabVax decided to completely shut down the Clinical Trial, stop any ongoing treatment of patients, and cease enrolling patients in the Clinical Trial because of the four patients having developed "Severe" pneumonitis.

101.     Defendants, of course, did not disclose the cessation of the Clinical Trial until October 15, 2018. While discovery will pinpoint precisely when the decision was made to shut down the trial; however, on information and belief, cases of pneumonitis began to surface in late 2016 and early 2017. Defendants not only knew about, but also intentionally failed to disclose anything about those cases for at least a year, and the Clinical Trial was suspended months before any disclosure was made.

   4. *Defendants' Specific Materially Misleading or False Statements and Omissions from August 2016 through November 14, 2016.*

102.     Defendants made misleading statements and caused MabVax to issue misleading press releases concerning the progress of the company's Phase 1 HuMab-5B1 Clinical Trial. The HuMab-5B1 antibody was MabVax's key asset, on which the Company's prospects heavily relied; and because of that, Defendants caused MabVax to issue misleading press releases concerning the progress of the company's Clinical Trial. Failure of the Phase 1 HuMab-5B1

NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

Clinical Trial was highly likely to impair Defendants' ability to raise capital to continue funding MabVax and their excessive personal compensation.

103.    In a June Corporate Presentation that was attached as an Exhibit to a June 15, 2016, Form 8-K SEC Filing made in and from California, Hansen touted the efficacy of the HuMab-5B1/MVT-5873 antibody in laboratory tests, but at dosages in excess of 3mg per kilogram (the highest dosage level MabVax's Clinical Trial tested). Specifically, it touted a 33% reduction in tumor growth in laboratory tests compared to the control group (which received standard of care chemotherapy) after 42 days of administering the HuMAb-5B1/MVT-5873 antibody at 5mg per kg, a 39%.

104.    In August 2016, Defendants, on information and belief while in California, specifically orally represented to M. Brauser (the President of the Grander Holdings401K Plan Administrator) that the Clinical Trials had delivered "promising" results and were "positive." These representations were materially false and misleading because Defendants failed to disclose that patients had already exhibited Adverse Events and that 2/3 of the cohort at the 3mg per kg level had experienced Severe Adverse Events. In doing so, Defendants omitted statistically significant evidence of Adverse Events which effect the commercial viability of the HuMab-5B1/MVT-5873 antibody given that Defendants had been touting the efficacy of same in tests at levels beyond the Maximum Tolerable Dose.

105.    In an August Corporate Presentation that was attached as an Exhibit to another Form 8-K Filing that was made from California, Hansen again touted the efficacy of the HuMab-5B1/MVT-5873 antibody in laboratory (non-human) tests, but in dosages that far exceeded the 3mg per kg dose that had already produced Severe Adverse Events in 2/3 of the human test subjects without disclosing that important fact. In fact, the data presented was the same as he had

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

presented in June. By August 2017, however, he, MabVax, and Hanson were all aware that the Maximum Tolerable Dose was substantially lower. This omission made the August presentation misleading because it promoted the efficacy of a treatment at dosage levels that could not be safely administered in humans.

106.    Whether the MabVax's HuMab-5B1/MVT-5873 antibody could be safely administered at efficacious levels was material. Deprived of the knowledge that 2/3 of the 3mg per kilogram cohort had experienced Severe Adverse events at a dosage level that was twice the Minimum Tolerable Dose and that was 40% lower than the levels, M. Brauser caused Grander Holdings 401K to invest $1,000,000 in MabVax on August 17, 2016.

107.    Had Defendants not misrepresented and omitted material information, it would not have made that investment.

    *5. Defendants' Specific Material Misleading or False Statements and Omissions from August 17, 2016, through May 5, 2017.*

108.    On November 14, 2016, Defendants, from and in California, caused MabVax from California to issue a press release from its headquarters in California, which press release was simultaneously filed as an exhibit to a Form 8-K with the SEC, purporting to report "Interim Safety Results" from the Phase I Clinical Trial. The press release was headlined with a statement that "Sufficient safety established to initiate the evaluation of MVT-5873 as a front-line therapy in combination with a standard of care chemotherapy." The press release further stated:

> The MVT-5873 phase I clinical trial initiated in February 2016 is designed to establish safety and determine the recommended phase II dose (RP2D) for MVT-5873 as both as monotherapy (Part 1 of the trial), and in combination with standard of care chemotherapy (Part 2) using nab-paclitaxel plus gemcitabine. Initiation of Part 2 requires establishing three safe dose levels for MVT-5873 as monotherapy in patients with relapsed or refractory locally advanced or metastatic pancreatic cancer. The Company reports that the safety of MVT-5873 has been established at three incremental dose levels by treating 16 patients at three clinical sites. While patients continue to be recruited to establish the RP2D, the Company also reports

24

that Part 2 of the clinical trial is now open and will include patients with previously untreated pancreatic cancer receiving a standard of care chemotherapy as defined in the protocol.

(emphasis added)

109.    The November 14, 2016, and Form 8-K filed on the same day were materially false and misleading. While it was correct that as of November 14, 2016, MabVax had dosed patients at three incremental dose levels (1, 2, and 3 mg per kg) only one of those dosage levels was "safe." It was not true that "safety" had been established at each of those dosage levels.

110.    Further, although MabVax had "open[ed]" Phase 1b of the Clinical Trial, the stated precondition for that event (establishment of three safe dose levels) had not been achieved, contrary to the implication of that press release. As of that date, dosage at the levels of 2 mg per kg, and 3 mg/kg had caused patients to encounter a large number of Severe Adverse Events. Even at 1 mg per kg, numerous Adverse Events had been noted, including several Grade 3 (Severe) Adverse Events.

111.    On December 7, 2016, Defendants, from and in California, caused MabVax from California to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck that had been provided to some investors. The presentation contained a slide representing that a "Positive" milestone had been achieved in the HuMab-5B1/MVT-5873 Clinical Trial. Specifically, it provided: "Early safety established at interim milestone readout in November" and "Early safety and tolerability established in 16 patients treated in three escalating dose cohorts."

112.    The December 7, 2016, Form 8-K filing was materially false and misleading because MabVax had not achieved safety and tolerability of its HuMab-5B1/MVT-5873 antibody therapy "in three escalating dose cohorts" for the reasons set forth above. And even

then, there were several Grade 3 Severe Adverse Events. Only one of those dosage levels might reasonably be considered "safe."

113.    On February 13, 2017, Defendants, from and in California, caused MabVax from California to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck that had been presented at the BIO CEO 2017 Investor Conference. The presentation contained a slide containing the following statements:

◆ **MVT-5873 Summary and Opportunity**
- – Efficacy signals from initial monotherapy phase I trial in stage 3 and 4 pancreatic patients very encouraging
- – Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)
- – Most dosage levels tolerated reasonably well with most AEs transient elevations in LFTs.

114.    The statement in the February 13, 2017 Form 8K that "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)," was materially false and misleading because it omitted to state that dosage levels above 1 mg per kg were unsafe and exceeded the Maximum Tolerable Dose for the HuMab-5B1/MVT-5873 antibody. The statement that "most dosage levels tolerated reasonably well" was also materially false and misleading because any dosage levels of the HuMab-5B1/MVT-5873 antibody above 1 mg per kg were not tolerated "reasonably well." They instead caused patients to suffer dozens of Severe or Life-Threatening Adverse Events. In addition, these doses led to numerous dose-limiting toxicities requiring dose reduction, delay, or discontinuation of treatment.

115.    On March 1, 2017, Defendants, from and in California, caused MabVax from California to file an Annual Report on Form 10-K for the fiscal year ended December 31, 2016. That Form 10-K was signed by both Defendants Hansen and Hanson in California. Both Defendants Hansen and Hanson signed and filed with the SEC separate certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 attesting that they each had (a) reviewed MabVax's Annual Report on Form 10-K, and (b) based on their respective knowledge, the report

26

did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

116.    MabVax's Annual Report on Form 10-K for the fiscal year ended December 31, 2016, stated in part that "the safety of MVT-5873 had been established at three incremental dose levels by treating 16 patients at three clinical sites." This statement was materially false and misleading for the reasons set forth above.

117.    On March 31, 2017, Defendants, from and in California, caused MabVax from California to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck. The presentation contained a slide containing the following statements: "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg);" and, "most dosage levels tolerated reasonably well with most AEs transient elevations in LFTs."

118.    The statement in the slide presentation filed with the March 31, 2017, Form 8-K that "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)," was materially false and misleading because it omitted to state that dosage levels above 1 mg per kg were unsafe and exceeded the Maximum Tolerable Dose for the HuMab-5B1 (MVT-5873) antibody. The statement that "most dosage levels tolerated reasonably well" was also materially false and misleading because any dosage levels of the HuMab-5B1/MVT-5873 antibody above 1 mg per kg was not tolerated "reasonably well," but rather caused patients to suffer dozens of Severe Adverse Events causing dose-limiting toxicities and requiring patients delay or reduce dosing or discontinue treatment. In addition, the statement "transient elevations in LFTs" is false. While some LFTs returned to ≤ Grade 1, many patients continued to have elevated LFTs for several weeks to months. Defendants and MabVax later stated in a June 5, 2017 press release that 1 mg

27

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

per kg was the Maximum Tolerable Dose of its HuMab-5B1 (MVT-5873) antibody. Even assuming that 1 mg/kg in the Phase 1a (monotherapy) trial could be characterized as "safe" (which is far from clear), the higher dosages certainly could not be so described. Dosage above 1 mg/kg was unsafe. Additionally, the statement "most [Adverse Events] [were] transient elevations in [Liver Function Tests]" was false or misleading. On information and belief, most patients' elevated Liver Function Tests were not "transient." While some patients' Liver Function Tests declined fairly quickly, many patients continued to have elevated results for several weeks to months.

119.    On May 5, 2017, Defendants, from and in California, caused MabVax from California to file with the SEC an Amended Registration Statement on Form S-1/A in connection with an offering of MabVax Series G Convertible Preferred Stock. That Form S-1/A was signed by both Defendants in California. The Prospectus Summary section of the Form S-1/A reported on the status of MabVax's Clinical Trial, stating the following:

> "[T]he safety of our HuMab-5B1 antibody designated as MVT-5873 had been established at three incremental dose levels in our phase I clinical trial . . . Patients continue to tolerate the study drug reasonably well with drug infusion reactions being the most common adverse event which is adequately addressed by slowing the infusion rate and use of routine premedication. Increases in liver function tests are seen early in a minority of patients and appear reversible."

120.    These statements were materially false and misleading because as of the date they were made, MabVax had not achieved safety of its HuMab-5B1/MVT-5873 antibody "at three incremental dose levels," and the treatment was not "reasonably well" tolerated. MabVax had by this time dosed patients at four incremental dose levels, but only the 1 mb per kg level did not have dose limiting toxicities associated with it although there were several Grade 3 Severe Adverse Events; meaning only one (not all) of those dosage levels *might* be considered "safe." The additional statement that increases in liver function tests were seen in a "minority" of

patients was patently false. To the contrary, as set forth above, a large <u>majority</u> of patients in the Clinical Trial—80% or higher—had suffered from increases in liver function tests. Given the number of Severe Adverse Events that had already been associated with higher doses by the time of this May 7, 2017 statement, "safety" had not by any means "been established at three incremental dose levels."

121.    During early 2017, Defendants solicited Plaintiffs to purchase MabVax securities. Based upon the representations detailed above, Defendants fraudulently induced Plaintiffs to believe that MabVax's Clinical Trial was going well, that interim results were only positive, and that patients were tolerating the treatment well. Plaintiffs believed, as was represented to them, that their investments would be used to fund the Clinical Trial. Instead, the investments were used to fund Defendants' compensation.

120.    However, Defendants <u>knew</u> well before then that patients in the Phase 1a "Monotherapy" portion of the Clinical Trial had encountered a disturbingly large number of Severe Adverse Events, principally liver toxicity. At the same time, Defendants also <u>knew</u> that the initial results from the Phase 1b "Combination Therapy" portion of the Clinical Trial were even worse, with severe liver toxicity that persisted as well as pneumonitis at Grade 3 – Severe pneumonitis.

121.    Plaintiffs' investments in May 2017 and thereafter were made pursuant to MabVax's publicly filed S-1 with the SEC, which was signed by both Hansen and Hanson in California on May 5, 2017 and filed on May 12, 2017. However, it omitted material information that induced the Plaintiffs to invest.

122.    In reliance upon Defendants' false and misleading statements identified in paragraphs 191 through 205 above, Grander Holdings invested $350,00 in MabVax on May 2,

2017.

123.    Had Defendants not misrepresented and omitted material information, it would

not have made that investment.

> 6.  *Defendants' Specific Material Misleading or False Statements and Omissions from May 5, 2017, through October 11, 2017.*

124.    On May 22, 2017, Defendants, in and from California, caused MabVax from

California to file a Quarterly Report on Form 10-Q for the quarter ending March 31, 2017 (the

"Q1 2017 Form 10-Q"). That Form 10-Q was signed by both Defendants in California. Both

Defendants signed and filed with the SEC separate certifications pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002 attesting that they each had (a) reviewed the report, and (b) based

on their respective knowledge, the report did not contain any untrue statement of a material fact

or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading.

125.    In reporting on the interim results of the HuMab-5B1/MVT-5873 Clinical Trial,

MabVax's Q1 2017 Form 10-Q reported in part that:

> the safety of our HuMab-5B1 antibody designated as MVT-5873 had been established at three incremental dose levels in our phase I clinical trial. . . . After establishing the current dosage safety level for MVT-5873 in Part 1 of the trial, we were able to initiate part 2 of our phase I study. Part 2 combines MVT-5873 with a standard of care chemotherapy regimen in newly diagnosed treatment naïve patients. . .
>
> As of April 2017, we had enrolled 29 patients in Part 1 of our phase I trial at three clinical sites. Twenty-five patients are currently evaluable.
>
> **Patients continue to tolerate the study drug reasonably well with drug infusion reactions being the most common adverse event, which is adequately addressed by slowing the infusion rate and use of routine premedication.** Increases in liver function tests are seen early in a minority of patients and appear reversible.

(emphasis added).

126.    These statements in MabVax's Q1 2017 Form 10-Q were materially false and misleading. As of the filing date, MabVax had <u>not</u> achieved safety of its HuMab-5B1/MVT-5873 antibody "at three incremental dose levels," and the treatment was not "reasonably well tolerated" and it was false that increases in lever function tests were seen only in a "minority of patients," for the reasons set forth above.

127.    MabVax's Q1 2017 Form 10-Q was also materially false and misleading because it omitted that by that time at least five six patients in its Phase 1b/Combination Trial had suffered Severe Adverse Events, including liver toxicity and two cases of pneumonitis. It was further false and misleading in stating that "after establishing the *current* dosage safety level for MVT-5873 in Part 1 of the trial, we were able to initiate part 2 of our phase I study," while omitting to mention that, due to the high rate of Adverse Events suffered from the first cohort of patients enrolled in "part 2 of our phase I study," the dosage level for subsequent patients had to be reduced eight- fold, from 1 mg per kg to 0.125 mg per kg. (emphasis added)

128.    In fact, it was not until a June 5, 2017, press release that MabVax publically stated it had determined that the Maximum Tolerable Dose for its antibody in humans was 1mg per kg.

129.    Between May and August 2017, Defendants knew that patients in the Phase 1a "Monotherapy" portion of the Clinical Trial had encountered a disturbingly large number of Severe or Life Threatening Adverse Events, principally liver toxicity and that the initial results from the Phase 1b "Combination Therapy" portion of the Clinical Trial were even worse given that at least five of the first six patients in the Phase 1b Combination Trial (83%) had encountered Grade 3 or 4 Adverse Events, a remarkably high number.

130.    Despite that knowledge, during May-August 2017, Defendants solicited Plaintiffs to purchase additional MabVax securities, which they did. Based upon the representations

detailed above, Defendants fraudulently induced Plaintiffs to believe that MabVax's Clinical Trial was going well, that interim results were only positive, and that trial patients were tolerating the treatment well.

131.    In August 2017, MabVax was again running out of cash to operate its business, and the Clinical Trial was not going well. MabVax only had enough money to last until late September or early October 2017. Moreover, its entire clinical operations department had quit, three of the Company's five executives had given notice that they were quitting, certain vendors were refusing to provide further services until their accounts were brought current, and the Company had no money to enroll additional patients in the Clinical Trial.

132.    At a MabVax Board of Directors meeting on or about August 27, 2017, Defendant Hansen presented a plan to wind down the Company. The broad outline of the plan was for the Company to cut expenses to the bone, retain an investment banker to market all of MabVax's assets for potential sale, and then with the expectation that all assets would be sold by the end of 2017, to then sell off or reverse merge MabVax's corporate shell.

133.    On September 6, 2017, MabVax announced that it had engaged Greenhill & Co., an independent investment bank, to serve as a financial advisor to assist MabVax in exploring and evaluating strategic options with the goal of maximizing shareholder value. The release quoted Defendant Hansen stating, "As part of our ongoing evaluation and prioritization of our portfolio of assets, and in response to inbound inquiries, we have engaged an industry-leading firm to advise us on potential alternatives and strategies that will have the potential to unlock shareholder value." The press release was materially misleading by omitting to state that Hansen had previously disclosed to MabVax's Board the disappointing Clinical Trial results, and that

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

Hansen had presented the Board a plan to divest MabVax of all of its assets and leave it as an empty corporate shell by the end of 2017.

134.    In reliance upon Defendants' misrepresentations and omissions, Plaintiffs made further investments in MabVax during September and October 2017 pursuant to (i) an S-3 signed by both Defendants in California which MabVax filed, from California, on July 14, 2017 (the "July 14, 2017 S-3"), and (ii) publicly filed prospectus supplements, which Defendants, in California, caused MabVax to file from California on September 13, 2017 (the "September 13, 2017 Prospectus Supplement") and October 11, 2017 (the "October 11, 2017 Prospectus Supplement"). The S-3 and prospectus supplements incorporated certain publicly filed documents by reference.[6]

135.    The July 14, 2017, S-3, September 13, 2017, Prospectus Supplement and October 11, 2017 Prospectus Supplement omitted material information that caused the Plaintiffs to invest. Had MabVax and Defendants not materially omitted that information, Plaintiffs would not have invested.

136.    In reliance upon Defendants' false and misleading statements identified in in this section, Grander Holdings 401K and M. Brauser made the following additional investments in MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $250,000 | 8/21/2017 |
| M. Brauser | $250,000 | 9/14/2017 |
| M. Brauser | $249,700 | 9/22/2017 |
| M. Brauser | $200,000 | 10/10/2017 |

137.    Had Defendants not misrepresented and omitted material information, they would not have made those investments.

---

[6] All three filings expressly incorporated by reference MabVax's 2016 Annual Report on Form 10-K and Q1 2017 Form 10-Q, including the false statements contained in those documents.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

7. *Defendants' Material Misleading or False Statements and Omissions from October 12, 2017, through February 6, 2018.*

138.   On October 31, 2017, Defendants, from and in California, caused MabVax from California to issue a press release from California providing an "Update on the MVT-5873 Phase 1 Clinical Program." The press release described the status of the Phase 1b Combination Trial as follows:

> MVT-5873 in combination with nab-paclitaxel and gemcitabine as first line therapy – The Company reported that newly diagnosed pancreatic cancer patients participating in the Phase 1 clinical trial of MVT-5873, when given in combination with first line nabpaclitaxel and gemcitabine, demonstrated reductions in tumor size after the first two months of therapy. The data reported from this dose escalation safety study included safety data from 7 patients at 1 mg/kg and 0.125 mg/kg. After the first cohort was treated at 1 mg/kg, the MVT-5873 dose was reduced to 0.125 mg/kg in combination with nab-paclitaxel and gemcitabine as the lower dose appears to be generally well tolerated.

139.   Plaintiffs are informed and believe that this release was the first time that MabVax or Defendants disclosed to investors that the dosage level for patients in the Phase 1b Combination Trial was lowered from 1.0 mg per kg to 0.125 mg per kg, despite the fact that the change to a lower dosage had occurred starting ten months earlier, in January 2017.

140.   The October 31, 2017, press release was materially false and misleading, in at least three ways: (1) The treatment was not "generally well tolerated" by patients in the Phase 1b Combination Trial; for the reasons set forth above; (2) It omitted to state that the dosage of antibody administered to patients in the Phase 1b Combination Trial had to be lowered by a factor of eight specifically because of the large number of persistent Severe Adverse Events suffered by the first cohort of three patients; and (3) It omitted to state that even after reduction of dose, two of the first three patients who received the reduced dose suffered from Grade 3 pneumonitis, the specific condition that eventually caused MabVax to ultimately shut down the trial entirely when the it surfaced in additional patients.

141.    On November 7, 2017, Defendants, from and in California, caused MabVax from California to file a Quarterly Report on Form 10-K for the quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q"). That Form 10-K was signed by both Defendants Hansen and Hanson in California. Both Defendants Hansen and Hanson signed and filed with the SEC separate certifications pursuant to Section 302 of the Sarbanes-Exley Act of 2002 attesting that they each had (a) reviewed the report, and (b) based on their respective knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

142.    In reliance upon Defendants' false and misleading statements identified above, Plaintiffs made the following additional investments in MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $250,000 | 2/6/2018 |
| Brauser Family Trust | $75,000 | 2/6/2018 |
| B. Brauser J. Brauser | $50,000 | 2/6/2018 |
| D. Brauser | $50,000 | 2/6/2018 |
| G. Brauser | $50,000 | 2/6/2018 |
| J. Brauser | $50,000 | 2/6/2018 |

143.    Had Defendants not misrepresented and omitted material information, they would not have made those investments.

> 8. *Defendants' Specific Material Misleading or False Statements and Omissions After February 6, 2018.*

144.    On February 6, 2018, Defendants, from and in California, Caused MabVax to file from California a Current Report on Form 8-K, which attached a press release announcing a private placement securities offering. This press release quoted Hansen as stating, "Our clinical trial of MVT-5873 [HuMab-5B1] in combination with chemotherapy has continued to yield encouraging results. . . . Therefore, we intend to allocate a portion of the funds raised to continue

35

patient enrollment at the current treatment level to continue to confirm results seen to date." These statements materially false and misleading because the safety results were anything but "encouraging." Hansen knew at that time that five of the first six patients in the Combination Trial had encountered at least one Severe or Life-Threatening Adverse Event, necessitating cessation of treatment, by early June 2017. Second, Hansen also knew that the dosage of antibody administered to patients in the Combination Trial had to be lowered by a factor of eight due to the large number of persistent Adverse Events suffered by the first three-patient testing sample. Third, Hansen also that even after reduction of dose, two of the first three patients who received the reduced dose suffered from Grade 3 pneumonitis, which, as set forth above, is the specific condition that caused MabVax to suspend the trial when the condition presented in additional patients.

145.    On information and belief, in late 2017 MabVax enrolled an additional cohort of three patients into the Combination Trial, bringing the total number of patients in the Combination Trial to nine. On further information and belief, these additional three patients received doses of antibody at the level of 0.125 mg/kg, bringing the number of patients in the Combination Trial who had received doses at the 0.125 mg/kg level to six.

146.    On February 12, 2018, Defendants, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K, which attached a press release with a headline that trumpeted "MabVax Therapeutics Announces Positive Interim Data from Expanded Cohort in Phase 1 Trial Evaluating MVT-5873 in Combination with First-Line Chemotherapy in Pancreatic Cancer." The press release described six patients who had been administered the Combination Trial at the lower dose level of 0.125 mg per kg, and claimed that

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

the treatment "was generally well tolerated by all subjects," and that the "promising early results merit additional enrollment."

147.    These statements were materially false and misleading, because three of those six patients developed Grade 3 or Grade 4 pneumonitis, the specific condition that caused MabVax to shut down the trial entirely when the condition surfaced in additional patients.

148.    MabVax's former Vice President of Pharmaceutical Development, Paul Maffuid, has testified under oath that the third incidence of pneumonitis was sufficiently "serious" in nature, that MabVax had to notify the Food and Drug Administration, and revise its enrollment bulletin for patients. A "Serious" Adverse Event under the FDA guidelines, is not measured under the five-grade CTCAE criteria (first referenced in paragraph 8, *supra*), Rather, a "Serious" Adverse Event under the FDA guidelines is even more significant than a Grade 3 (Severe) Adverse Event under the CTCAE criteria. Specifically, Serious Adverse Events as defined by the FDA guidelines include those that result in death, require either inpatient hospitalization or the prolongation of hospitalization, are life-threatening, result in a persistent or significant disability/incapacity or result in a congenital anomaly/birth defect.

149.    All of those facts were omitted from the February 12, 2018 Form 8-K filing and press release, which instead stated that the data generated to date was "Positive" and that the Combination Trial treatment was "generally well tolerated by all subjects." In truth, on information and belief, three of the first six patients treated at the lowered, 0.125 mg/kg dose, suffered Grade 3 or worse pneumonitis.

150.    On or about April 2, 2018, Defendants, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K that attached a press release reporting operational and financial results. This press release quoted Defendant Hansen as stating

37

"We have made notable progress with our MVT-5873 [HuMab-5B1] and MVT-1075 clinical programs and are very encouraged with the positive data we have seen to date. We look forward to continuing enrollment in each program and participating in key scientific conferences over the course of 2018[.]"

151.    The April 2, 2018 press release was materially false and misleading because it omitted to disclose that the majority of patients in the Phase 1b Combination Trial had suffered Severe or Life Threatening Adverse Events. This included three patients who had developed Grade 3 or Grade 4 pneumonitis, the specific condition that eventually caused MabVax to shut down the trial.

152.    On or about May 3, 2018, Defendants, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K that attached a press release announcing a private placement securities offering. This press release quoted Defendant Hansen as stating:

MabVax intends to use the net proceeds of the offering to fund continuing clinical developments of its HuMab 5B1 antibody designated MVT-5873 in combination with gemcitabine and nab-paclitaxel in first line therapy for the treatment of patients newly diagnosed with pancreatic cancer. The Company has treated two cohorts of patients for a total of six patients to date in this study; and these funds will enable the Company to continue enrolling up to approximately 10 additional patients with the objective of confirming early observations.

153.    The May 3, 2018 press release was materially false and misleading because it omitted to disclose that the majority of patients in the Phase 1b Combination Trial had suffered Severe or Life Threatening Adverse Events. This included three patients who had developed Grade 3 or Grade 4 pneumonitis, the specific condition that eventually caused MabVax to shut down the trial.

154.    In reliance upon Defendants' false and misleading statements identified above,

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

Plaintiffs made the following additional investments in MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $100,000 | 5/11/2018 |
| B. Brauser | $20,000 | 5/11/2018 |
| D. Brauser | $20,000 | 5/11/2018 |
| G. Brauser | $20,000 | 5/11/2018 |
| J. Brauser | $20,000 | 5/11/2018 |
| **Total** | **$180,000** | |

155.    Plaintiffs are informed and believed that at some point in 2018, a fourth participant in the Phase 1b Combination Therapy portion of the Clinical Trial developed pneumonitis. At that point, MabVax's team, including Hansen, determined that the Clinical Trial needed to be shut down to protect patients. Any ongoing treatment of patients was halted, and enrollment of additional patients was indefinitely suspended.

156.    Defendants were both personally informed by other MabVax employees or the clinicians conducting and overseeing the trials that patient enrollment in the trial was being suspended; but neither MabVax nor Defendants timely disclosed that salient fact.

157.    MabVax's and Defendants' did not publically acknowledge that anything problematic concerning the continued viability of the Clinical Trial until the October 15, 2018, in MabVax's Form 10-Q for the first quarter of 2018, which was signed by both Defendants and which was filed extremely late.  There, MabVax and Defendants acknowledged the following:

> On February 12, 2018, we reported on interim results of the current cohort of the Phase 1 study, in which MVT-5873 was given in combination with nab-paclitaxel and gemcitabine to patients newly diagnosed with CA19-9 positive pancreatic cancer. MVT-5873 at a dose of 0.125 mg/kg when added to first-line chemotherapy was generally well tolerated by all subjects. At that time, all six patients in the current cohort demonstrated measurable tumor reductions, with four patients meeting the criteria for partial response (PR) and two patients meeting the criteria for stable disease (SD). We believe these results further confirm results reported on a portion of the cohort in late 2017. Patient CA19-9 levels, which are a prognostic indicator of the disease state, were markedly reduced in all subjects with this combination therapy. Due to adverse events potentially related to the combination of nab-paclitaxel, gemcitabine and MVT-5873, not seen in the monotherapy clinical

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

study, the Company has suspended patient enrollment at the current dose. We are evaluating plans to enroll additional patients at a lower dose to further explore safety and response in a larger population.

158.    At no point before October 15, 2018, did MabVax and Defendants acknowledge in an 8-K or otherwise that patient enrollment had been suspended due to the prevalence of many Severe Adverse Events all while continually soliciting further investment from Plaintiffs.

159.    All told, the Plaintiffs made the following investments in MabVax in reliance on Defendants' false and misleading statements identified above:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $1,000,000 | 8/17/2016 |
| Grander Holdings | $350,000 | 5/2/2017 |
| Grander Holdings 401K | $150,000 | 5/18/2017 |
| Grander Holdings 401K | $250,000 | 8/21/2017 |
| M. Brauser | $250,000 | 9/14/2017 |
| M. Brauser | $249,700 | 9/22/2017 |
| M. Brauser | $200,000 | 10/10/2017 |
| Grander Holdings 401K | $250,000 | 2/6/2018 |
| Brauser Family Trust | $75,000 | 2/6/2018 |
| B. Brauser | $50,000 | 2/6/2018 |
| D. Brauser | $50,000 | 2/6/2018 |
| G. Brauser | $50,000 | 2/6/2018 |
| J. Brauser | $50,000 | 2/6/2018 |
| Grander Holdings 401K | $100,000 | 5/11/2018 |
| B. Brauser | $20,000 | 5/11/2018 |
| D. Brauser | $20,000 | 5/11/2018 |
| G. Brauser | $20,000 | 5/11/2018 |
| J. Brauser | $20,000 | 5/11/2018 |
| **TOTAL** | **$3,154,700** | |

160.    Had Plaintiffs been made aware of the truth about MabVax's and Defendants' material misrepresentations and omissions in MabVax's SEC filings, they would never have made those investments in MabVax.  MabVax is now in bankruptcy, and its stock is worthless.

161.    MabVax's and Defendants' material misrepresentations and omissions not only induced Plaintiffs' investments, but they also are directly and causally connected to Plaintiffs' losses.  The fact that the Clinical Trial had been plagued by a majority of patients suffering

40

Severe Adverse Events, the prevalence of which directly led to the suspension of the Clinical Trial—in direct contravention of Defendants' many material misrepresentations and omissions set forth above—directly and negatively affected MabVax's ability to continue soliciting the funds in needed to continue as a going concern.  This ultimately was the cause of MabVax's bankruptcy and Plaintiffs' injury. MabVax's and Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions—that MabVax would fail. In other words, MabVax's and Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

## <u>COUNT I</u>
### Violations of Sections 25400(d) and 25500 of the California Corporations Code

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through 161 above, and further allege:

162.     This claim is asserted against the Defendants on behalf of Plaintiffs, which purchased MabVax securities throughout 2016, 2017, and 2018.

163.     Defendants willfully carried out a plan, scheme, and course of conduct that was intended to and did deceive Plaintiffs as investors in MabVax, as alleged herein.

164.     Defendants made or materially participated in the act of making statements that, at the time and in the light of the circumstances under which they was made, were false and misleading with respect to a material fact, or omitted to state material facts necessary in order to make their statements, in the light of the circumstances under which they were made, not misleading, with the purpose of inducing Plaintiffs to purchase MabVax securities that Defendants were selling.

165.     Plaintiffs allege this claim based on MabVax's and Defendants' materially

misleading statements or omissions set forth in detail above including:

(a)    Touting the efficacy of the HuMab-5B1/MVT-5873 antibody at dosage levels they knew were well above the Maximum Tolerable Dose;

(b)    Failing to disclose the prevalence of Severe Adverse Events suffered by patients in the Clinical Trial, which surfaced as early as mid-2016, and consistently arose through 2017 and into 2018;

(c)    Misrepresenting that the antibody treatment was "well tolerated" despite the fact that it caused a majority of patients to suffer Severe Adverse Events;

(d)    Misrepresenting that the Clinical Trial had delivered "promising" results and were "positive;" and

(e)    Omitting that patient enrollment in the Clinical Trial had been suspended due to the prevalence of Severe Adverse Events suffered by patients.

166.    All of these statements and omissions, and many other communications identified above, were made by Defendants in California, at the headquarters of MabVax.

167.    Defendants knew, or recklessly disregarded, that their misstatements and omissions were false and misleading when made. Such material misstatements and omissions were made knowingly or recklessly and for the purpose of and effect of concealing information from Plaintiffs to secure their investments. At the time MabVax and Defendants made the misstatements or omissions, they were aware of (or had access to) the facts regarding the Oxford Loan and Phase 1 that they misrepresented or omitted.

168.    Defendants, with the willful intent to defraud, intended that that their misstatements

and omissions had the unlawful purpose of inducing Plaintiffs into purchasing securities. The Defendants had actual knowledge that Plaintiffs would not invest if they were told the truth of any one of the above statements.

169.    The Defendants were the top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made verbal representations to the Plaintiffs as well.

170.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint as all such facts were readily available to them. The Defendants' material misrepresentations and omissions were done knowingly and recklessly and for the purpose and effect of concealing information from the solicited investors in order to secure their investments.

171.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, and in reliance on that information, the Plaintiffs invested in Mabvax as alleged above. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been timely disclosed. Plaintiffs would not have purchased MabVax shares, including at the prices they paid, or at all, had they been aware of Defendants' fraudulent course of conduct. Further, Defendants' misstatements and omissions directly and proximately caused Plaintiffs' losses because the material misrepresentations and omissions were pertinent to circumstances that ultimately culminated to cause MabVax to enter bankruptcy after directly and

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

proximately causing the value of Plaintiffs' investments to plummet and thereby damage Plaintiffs.

172.    Defendants' misstatement and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

173.    As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments, and their loss was directly and proximately caused by Defendants' wrongful conduct.

## **COUNT II**
**Violations of Sections 25401, 25501, 25504, and 25504.1 of the**
**California Corporations Code Based Upon MabVax's Violations of Sections 25401 and 25501**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through 161 above, and further allege:

174.    This claim is asserted against the Defendants on behalf of Plaintiffs, which each purchased MabVax securities throughout 2016, 2017, and 2018.

175.    It is based on MabVax's and Defendants' materially-misleading statements or omissions set forth in detail above including:

      (a)    Touting the efficacy of the HuMab-5B1/MVT-5873 antibody at dosage levels they knew were well above the Maximum Tolerable Dose;

      (b)    Failing to disclose the prevalence of Severe Adverse Events suffered by patients in the Clinical Trial, which surfaced as early as mid-2016, and consistently arose through 2017 and into 2018;

      (c)    Misrepresenting that the antibody treatment was "well tolerated"

44

despite the fact that it caused a majority of patients to suffer Severe
Adverse Events;

(d)     Misrepresenting that the Clinical Trial had delivered "promising"
results and were "positive;" and

(e)     Omitting that patient enrollment in the Clinical Trial had been
suspended due to the prevalence of Severe Adverse Events suffered by
patients.

176.    Each of the related misrepresentations and omissions were made by MabVax and
Defendants in California at MabVax's headquarters.

177.    By virtue of their high-level positions within MabVax, participation in and
awareness of MabVax's operations, direct involvement in the day-to-day operations of MabVax,
and communications with MabVax's investors, the Defendants had the power to influence and
control and did influence and control, directly or indirectly, the decision-making of MabVax,
including the content and dissemination of the statements that Plaintiffs contend are false and
misleading. Each of the Defendants had access to the MabVax's public filings and had the ability
to prevent the issuance of the false statements and material omission or cause such misleading
statements and  omissions to be corrected. For example, Hansen signed the January 30, 2018,
Form 8-K in California. Hanson signed certain filings as well in California. The May 12, 2017 S-
1 and July 14, 2017 S-3, which were deficient and materially omitted information that caused
Plaintiffs to invest, was signed by both Defendants in California.

178.    Both Defendants retained significant managerial power in MabVax. Defendants
regularly negotiated contracts with Plaintiffs on MabVax's behalf, explained MabVax's corporate
strategy to Plaintiffs, solicited investors on MabVax's behalf, hired employees, and discussed

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

potential board members. In short, Defendants directly control MabVax and materially aided and assisted MabVax in the conduct that gives rise to every cause of action in the Complaint.

179.    MabVax's material misstatements and omissions constitute primary violations of Section 25401 of the California Corporations Code, establishing its liability under Section 25501, because MabVax—from and in California—sold and offered to sell securities to Plaintiffs by means of those material misrepresentations and omissions.

180.    Defendants are liable under Section 25504 of the California Corporations Code because MabVax is liable under Section 25501 for its violations of Section 25401 at a time when both Defendants controlled it. Moreover, Hansen was a principal executive officer and a director of MabVax; and both Defendants materially aided in MabVax's acts and transactions constituting violations of Section 25401.

181.    Defendants are also liable under Section 25504.1 of the California Corporations Code because MabVax is liable under Section 25501 as a result of its violations of Section 25401 and both Defendants materially assisted MabVax in those violations with the intent to deceive or defraud.

182.    Each of the Defendants had access to the MabVax's public filings and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected.

183.    Hansen and Hanson signed the various SEC filings at issue containing material misrepresentations and omissions in California. MabVax issued the SEC filings at issue containing material and misrepresentations and omissions from its headquarters in California.

184.    Both Defendants retained significant managerial power in MabVax. Defendants regularly negotiated contracts with Plaintiffs on MabVax's behalf, explained MabVax's

corporate strategy to Plaintiffs, solicited investors on MabVax's behalf, hired and fired employees, and discussed potential board members. In short, Defendants directly controlled MabVax and materially aided and assisted MabVax in the conduct that gives rise to this cause of action (and every cause of action in this Complaint).

185.    Defendants made untrue statements of material facts and omitted to state material facts that were necessary to make those statements, in the light of the circumstances under which the statements were made, not misleading. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made materially false verbal representations to the Plaintiffs as well.

186.    Defendants knew (or were reckless in disregarding) that at the time they were inducing Plaintiffs to invest in MabVax that they were making material misrepresentations and omitting material facts related to the Oxford Loan and Phase 1 that Plaintiffs were entitled to know, that they would want to know, and that would impact Plaintiffs' decision to invest in MabVax.  When they did so, Defendants were aware of (or had ready access to) the very facts that they misrepresented and misleadingly omitted.

187.    MabVax and Defendants intended that Plaintiffs would rely on Defendants' material misrepresentations and omissions and invest in MabVax.

188.    In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true

47

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

information been disclosed. Plaintiffs' reliance upon these statements was reasonable. Further, Defendants' material misstatements and omissions directly caused Plaintiffs' loss.

189.     Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

190.     As a direct and proximate result of the MabVax's and Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases or acquisition of MabVax stock.

## COUNT III[7]
### Fraudulent Inducement

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through 161 above, and further allege:

191.     This claim is asserted against the Defendants on behalf of Plaintiffs, who both purchased MabVax securities throughout 2016, 2017, and 2018.

192.     The Defendants made materially false representations to Plaintiffs. The Defendants were the top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made materially false verbal representations to the Plaintiffs as well.

193.     Defendants knew that at the time they were inducing Plaintiffs to invest in

---

[7] Plaintiffs include the remaining causes of action despite the Court's dismissal of same for purposes of appeal.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

MabVax that they were omitting material facts that Plaintiffs were entitled to know, that they would want to know, and that would impact Plaintiffs' decision to invest in MabVax.

194.    Defendants intended that Plaintiffs would rely on Defendants' material misrepresentations and omissions and invest in MabVax.

195.    In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

196.    As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

197.    Defendants' misstatement and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

## <u>COUNT IV</u>
### Common Law Fraud

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through 246  above, and further allege:

198.    This claim is asserted against the Defendants on behalf of Plaintiffs, which purchased MabVax securities throughout 2016, 2017, and 2018.

199.    The Defendants made materially false representations to Plaintiffs. The Defendants were top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made materially false verbal representations to the Plaintiffs as well.

200.    Defendants knew that at the time they were inducing Plaintiffs to invest in MabVax that they were omitting material facts that Plaintiffs were entitled to know, that they would want to know, and that would impact Plaintiffs' decision to invest in MabVax.

201.    Defendants intended that Plaintiffs would rely on Defendants' material misrepresentations and omissions and invest in MabVax.

202.    In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

203.    As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

204.    Defendants' misstatement and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

205.    Defendants' material misstatements and omissions directly and proximately caused Plaintiffs' economic loss. The very pieces of information that Defendants made misleading statements about or omitted from Plaintiffs were the factors that caused the demise of

MabVax and the Plaintiffs to suffer losses.

<u>**COUNT V**</u>
**Common Law Negligent Misrepresentation**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through 246 above, and further allege:

206.    The relationship between Plaintiffs and Defendants constituted a special relationship in which Plaintiffs reposed in Defendants deep trust, dependence, confidence, counsel, and reliance such that a fiduciary relationship was established.

207.    Defendants knew that Plaintiffs would and did rely and depend on Defendants representations and judgments with regard to the funds Plaintiffs invested in MabVax and, in so doing, Defendants undertook Plaintiffs' trust and confidence and Defendants, by their words and action, undertook and assumed a duty to advise, counsel and protect Plaintiffs.

208.    Plaintiffs at all times relied upon Defendants' representations, financial judgment and decision-making with regard to MabVax and Plaintiffs' decision to invest in MabVax.

209.    Defendants were all aware of Plaintiffs' reliance, dependence upon, and trust of them as principals of MabVax.

210.    The Defendants made materially false representations to Plaintiffs. The Defendants were top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made material verbal misrepresentations to the Plaintiffs as well.

211.    In reliance and as a result of the dissemination of the materially false and

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

212.    As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

213.    Defendants' material misstatements and omissions directly and proximately caused Plaintiffs' economic loss. The very pieces of information that Defendants made misleading statements about or omitted from Plaintiffs were the factors that caused the demise of MabVax and the Plaintiffs to suffer losses.

214.    Defendants' misstatement and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. In other words, Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

### JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues so triable.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief and judgment:

(a) An award of monetary damages against Defendants, jointly and severally, in an amount according to proof at trial, together with interest thereon;

(b) Costs of suit, including but not limited to Plaintiffs' attorneys' fees and expert fees; and

(c) Such other and further relief as the Court deems just and proper.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

Dated:  May 25, 2022

Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH**
*Attorneys for Plaintiffs*
2 South Biscayne Blvd.
21st Floor
Miami, Florida 33131
Tel: (305) 373-9436
Fax: (305) 373-9443


By: */s/ Justin B. Kaplan*
Fla. Bar No. 0033725

*Justin.Kaplan@nelsonmullins.com*

*(Admitted pro hac vice)*

# EXHIBIT

# "B"

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRANDER HOLDINGS, INC., GRANDER HOLDINGS, INC. 401K PSP, BRAUSER FAMILY TRUST 2008, MICHAEL BRAUSER, DANIEL BRAUSER, BENJAMIN BRAUSER, GREGORY BRAUSER, and JOSHUA BRAUSER,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN DAVID HANSEN and GREGORY P. HANSON,<br><br>Defendants. | Case No.: 1:20-cv-8618-AKH<br><br>~~FIFTH AMENDED COMPLAINT~~<br><br>**[PROPOSED] SIXTH AMENDED COMPLAINT** |

Plaintiffs, ~~Granter~~Grander Holdings, Inc. ("Grander Holdings"), Grander Holdings, Inc. 401k PSP ("Grander Holdings 401K"), Brauser Family Trust 2008 ("Brauser Family Trust"), Michael Brauser ("M. Brauser"), Daniel Brauser ("D. Brauser"), Benjamin Brauser ("B. Brauser"), Gregory Brauser ("G. Brauser"), and Joshua Brauser ("J. Brauser") (collectively "Plaintiffs"), by and through undersigned counsel, sue Defendants, John David Hansen ("Hansen") and Gregory P. Hanson ("Hanson")(collectively, the "Defendants"), and allege:

**JURISDICTION, VENUE~~.~~, AND PARTIES**

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and more than $75,000 is at issue, exclusive of interest, costs and fees.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

3.      Personal jurisdiction over Defendants exists because Defendants regularly engaged in business and transacted business in New York, as discussed below, and because Defendants have consented to personal jurisdiction in New York.

**NELSON MULLINS RILEY & SCARBOROUGH | ATTORNEYS AND COUNSELORS AT LAW**
One Biscayne Tower | 2 South Biscayne Blvd. 21st Floor Miami, FL 33131 | T: 305.373.9400 | F: 305.373.9443 | nelsonmullins.com

4.      Numerous investment documents, including the August 11, 2017,
Securities

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Purchase Agreement and April 27, 2018, Securities Purchase Agreement, among others, signed

by the Plaintiffs in connection with the investments at issue state, in sum or substance:

> Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

5.      Several of the investment documents signed by the Plaintiffs make clear that this

forum-selection clause applies to claims "whether brought against a party hereto or its respective

affiliates, directors, officers, shareholders, partners, members, employees or agents," which

includes Defendants.

6.      During the relevant period, Defendants spoke with M. Brauser or other investors

including without limitation Barry Honig ("Honig") in New York and elsewhere, who

Defendants knew to be relaying such communications to other investors including the Plaintiffs

on several occasions to solicit investments that are at issue in this action. In addition to simply

having knowledge of the foregoing, Defendants intended that same occur and knew or should

have known that Plaintiffs would rely upon them when deciding whether to invest in MabVax.

7.      The claims alleged herein arise from the investment documents making clear that

New York is the appropriate forum, and the causes of action arise in part from these solicitations,

which took place in New York. Moreover, MabVax, at Defendants' direction, regularly transacted

business in New York, and entered into agreements with entities in New York, including with Cold

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Spring Harbor Laboratory, a nonprofit New York State education corporation, and Y-MABSY-mAbs

Therapeutics, Inc., which has a principal place of business in New York, New York. Also, an

investigative site for MabVax's clinical trials was Memorial Sloan Kettering Cancer Center in

~~Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42~~

investigative site for MabVax's clinical trials was Memorial Sloan Kettering Cancer Center in New York City.

8.      Plaintiff, Grander Holdings, is a company that was incorporated and exists under the laws of the State of Florida with its principal place of business located in Palm Beach County, Florida. Michael Brauser has at all times material been its President; and Grander Holdings is the Plan Administrator for the Grander Holdings 401K PSP.

9.      Plaintiff, Brauser Family Trust, is an irrevocable trust formed under the laws of the State of Florida. B. Brauser has at all times material been its Trustee; and he continues to be its Trustee. As B. Brauser brings this action as the Trustee of the Brauser Family Trust, he does so as a citizen of the State of Florida.

10.     Plaintiff, M. Brauser, is a citizen of Broward County, Florida.

11.     Plaintiff, D. Brauser, is a citizen of Broward County, Florida.

12.     Plaintiff, B. Brauser, is a citizen and resident of Palm Beach County, Florida.

13.     Plaintiff, G. Brauser, is a resident of Palm Beach County, Florida.

14.     Plaintiff, J. Brauser, is a resident of Palm Beach County, Florida.

15.     Defendant, John David Hansen, was, at all relevant times, President, CEO, and Chairman of the Board of Directors of MabVax. Hansen signed many of ~~MabVax's~~MabVax's public filings~~, including the January 30, 2018, Form 8-K, its February 6, 2018, and May 3, 2018, Form 8- Ks announcing the Series M and N Private Placement Financings~~. He is domiciled in California and on information and belief, was in California at all times material when Plaintiffs agreed to purchase all securities identified herein. Hansen personally solicited the one or more of the Plaintiffs, within and outside of California, on multiple occasions to make investments into

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page of 42

the company. Hansen also had personal knowledge of all the relevant material non-public information, was responsible for public disclosures, and otherwise had control over ~~MabVax's~~ MabVax's actions alleged herein.

16.     Defendant, Gregory P. Hanson, was, at all relevant times, the Chief Financial Officer ("~~"~~CFO~~"~~") of MabVax. Hanson also signed many of the SEC filings ~~at issue here~~described below and he was the MabVax officer who primarily corresponded by phone and email with Plaintiffs, including without limitation concerning the Series M and N Financings, and otherwise had control over ~~MabVax's~~MabVax's actions alleged herein. He is domiciled in California, and on information and belief, was in California at all times material when Plaintiffs agreed to purchase all securities identified herein.

## **GENERAL ALLEGATIONS**

**A. Introduction.**

17.     MabVax was originally incorporated in Delaware in 1988 under the name Terrapin Diagnostics, Inc. It was renamed Telik, Inc., ten years later; and it again changed its name to MabVax in September 2014 as a result of a merger with MabVax Therapeutics, Inc. As a Delaware company ~~at all times material~~, it and its officers, including the Defendants, were subject to the fiduciary provisions of the Delaware General Corporate Law.

18.     Because MabVax was always a publicly traded company ~~at all times~~ material to the claims alleged herein, it regularly made public filings to the SEC. Plaintiffs regularly relied on those public filings, which Hansen and Hanson had signed in California. As executives of a publicly traded company, Defendants knew or should have known that investors such as Plaintiffs would rely on ~~MabVax's~~MabVax's public filings.

19.     From and throughout 2014 through 2018, MabVax regularly described itself in public documents as a ~~"~~"clinical-stage biotechnology company focused on the development of

~~Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42~~

antibody-based  products  and  vaccines  to  address  unmet  medical  needs  in  the  treatment  of

cancer.~~"~~"

20.    ~~MabVax took the position at~~At all times material ~~that it "cannot earn product~~, it was primarily focused on developing a human monoclonal

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

antibody to treat pancreatic cancer. Its "lead" antibody program concerned the HuMab-51 antibody (also known as "MVT-5873"). The HuMab-51 antibody is of human origin and was discovered as a result of the immune response to an antigen-specific vaccine administered to cancer patients.

21.     MabVax took the position at all times material that it "cannot earn product revenue until it (or its collaborative partners) complete clinical trials, obtain regulatory approval, and successfully commercialize one or more of its products. As a result, the company has incurred, and will likely incur, substantial operating losses."" Consistent with its public statements, MabVax never developed a product to sell and never had more than minimal revenue.

~~21~~22.    At all times material, MabVax further stated that ""to continue its vitally important work, MabVax has raised, and if it can carry on, will have to continue to raise money through debt and equity financing.""

~~22~~23.    Plaintiffs collectively invested more $3,100,000 in MabVax between August 2016 and 2018.

~~23~~24.    ~~MabVax's~~MabVax's employee headcount dwindled from sixteen to six ~~during~~throughout 2017 and 2018, with Defendants at all times material the principal two remaining employees. ~~In light of~~Considering its diminutive size, Defendants were intimately familiar with ~~MabVax's~~MabVax's operations, including the status of its important clinical trials and the issuance of information to the public regarding same.

~~24~~25.    As is often the case, Plaintiffs invested in a company (MabVax) that operated in a field in which they were not experts. Because of this, among other reasons, Defendants knew that investors including Plaintiffs would and did rely on the ~~company's~~company's public filings, the

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

views of sophisticated institutional investors, and statements of the ~~company's~~ company's officers

and directors

(including Defendants)~~;~~:; and that Plaintiffs would expect ~~such~~those public filings, views, and statements, to be complete and truthful ~~when made~~.

~~25~~26. When Plaintiffs invested in MabVax, they did so believing that the investments would be used to—as MabVax puts it ~~—~~ "continue its vitally important work."

~~26~~27. Instead, Hansen, as ~~MabVax's~~MabVax's President and Chief Executive Officer, and Hanson, as its Chief Financial Officer, knowingly and willingly mislead Plaintiffs ~~in order~~ to secure and retain ~~Plaintiff's~~Plaintiff's investments largely to support and sustain Defendants' own

excessive compensation. In so doing, they received millions of Dollars ostensibly to bring a promising cancer treatment to market while instead primarily lining their own pockets. For example, during the relevant time period, Defendants'" total combined compensation including salary, equity grants, and other benefits was over $5,200,000[1]—vastly more than the average compensation for similarly-situated executives of early-stage companies, and much more reflective of companies in the Russell 2000 with assets between 10 and 125 times the amount of MabVax.[2]

28.    In order to fund their outsized salaries and to fund MabVax's development efforts, it was imperative that Defendants and MabVax continually obtain financing from outside investors, including Plaintiffs. From 2016 to 2018, Hansen and Hanson duped the Plaintiffs into making investments into MabVax by knowingly and intentionally making material misrepresentations and omissions that Plaintiffs relied upon in connection with investment

27.    Despite the Defendants causing MabVax to pay themselves excessive compensation, MabVax earned no significant revenue while they were in control or create any promising cancer therapies. Their combined compensation was on average one-third of the net cash that MabVax received through its financing endeavors between 2015 and the third quarter of 2018, however.

        B. MabVax Goes Public
28.    According to Mabvax, it had "reached the point where its committed existing private investors, founders, friends, and family could no longer shoulder the crushing expense of bringing new cancer treatments to market."

        29.    MabVax with Defendants at the helm attempted to solve its liquidity problems

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

1 In 2016, Hansen caused MabVax to compensate him $989,257 ($418,438 salary, $141,400 bonus, $393,702 options, $35,717 ""other comp""). In 2017, he caused MabVax to compensate him $2,165,915 ($427,876 salary, $448,500 in stock, $1,252,905 options, $36,634 ""other comp""); and in 2018, Hansen caused MabVax to pay him a salary of $430,000. In 2016, Hanson caused MabVax to compensate him $453,602 ($276,014 salary, $62,790 bonus, $99,743 options, $15,055 ""other comp""). Hanson similarly caused MabVax to compensate him $848,201 ($309,312 stock, $277,016 stock, $224,945 options, $36,928 ""other comp"") in 2016 and a salary of $317,386 in 2018. ~~Unfortunately, different public filings by MabVax include different compensation numbers for the Defendants.~~

2 For example, in ""The BDO 600"", a 2016 survey of CEO and CFO compensation practices, BDO found that the average compensation paid to CEOs of companies with $100M to $500M revenues and $1.25B in assets was $2,324,230 in 2015, similar to ~~Hansen's~~ Hansen's 2017 total compensation of $2,165,915. For CFOs, BDO found the average total compensation was $964,824, similar to ~~Hanson's~~ Hanson's 2017 total compensation of $848,201. Of course, ~~MabVax's~~ MabVax's

6

decisions and the subject of which caused Plaintiffs' economic loss.

29.    Specifically, Defendants repeatedly lied to Plaintiffs and other investors about the interim results and progress of MabVax's Phase I clinical trial of its lead therapeutic antibody, HuMab-B1 (also referred to as "MVT-5873"), generally, and specifically the high level of "adverse events" clinical patients suffered.

**B. The Phase 1 Clinical Trial.**

30.    MabVax initiated the "Phase I clinical trial" for the HuMab-B1 antibody therapy in February 2016. It was required to and did so to establish the safety of, and patient tolerability to MabVax's antibody.

31.    MabVax hoped to achieve those goals by conducting a two-part phase I clinical trial. In the first part, described by the Defendants as both "Phase 1a" and the "Monotherapy trial," MabVax administered the antibody to three-person groups of patients to identify a safe "Maximum Tolerable Dose." "Maximum Tolerable Dose" is defined in medical literature as the highest dose of a drug or therapy that does not cause unacceptable side effects or toxicity.

32.    Determining the Maximum Tolerable Dose was achieved by progressively increasing the dosage for each cohort until Dose Limiting Toxicities were noted (i.e. side effects from the treatment that are serious enough to deter addition dosage increases). Clinical trials typically

determine a "Maximum Tolerable Dose" as being the dose level immediately below the Dose Limiting Toxicity.

33.     In the second part of the Clinical Trial, described by the Defendants as both "Phase 1b" and the "Combination Trial," cohorts of patients were administered the Maximum Tolerable Dose of the HuMab-5B1/MVT-5873 antibody together with the standard of care (i.e. medically standard) chemotherapy treatment (nab-paclitaxel and gemcitabine) in order to

revenues and assets were nowhere close to $100M.        7

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

determine safety and tolerability.[3]

34.    MabVax's antibody treatment had safety problems from the beginning. Patients encountered a materially large number of adverse events—many "severe" adverse events. An "Adverse Event" is an unexpected negative medical occurrence associated with the use of a drug in humans. A "Severe Adverse Event" is an adverse event that is evaluated as Grade 3 or higher under the Common Terminology Criteria for Adverse Events ("CTCAE"), published by the United States Department of Health and Human Services.

35.    The Adverse Events that presented during the late spring and early summer of 2016 which led to dose-limiting toxicities at most dosage levels administered to patients, which alone precluded calling MabVax's therapy drug at that dose "safe" or "well-tolerated."

36.    Thirty-two patients participated in Phase 1a of MabVax's Clinical Trial; and they collectively encountered 172 Adverse Events, including without limitation liver damage, anemia, hyperglycemia, and several other material side effects. At least twenty-seven of those Adverse Events were graded "Grade 3 – Severe" or "Grade 4 – Life-Threatening." At least nine patients (nearly 1/3 of all patients) reached Dose Limiting Toxicity that required reducing or delaying their doses or discontinuing their treatment altogether.

37.    Defendants did not disclose to Plaintiffs and other investors the high prevalence of Severe Adverse Events (Grade 3) or Life-threatening Events (Grade 4) encountered by patients during the Phase 1a part of the Clinical Trial during 2016 and 2017—all while actively and personally pursuing investments from Plaintiffs. They instead concealed that negative information from investors and issued numerous false and misleading press releases and SEC filings which represented that interim results of Phase 1a of the Clinical Trial were **"positive"**

---

[3] Plaintiffs will collectively refer to the two parts of the trial as the "Clinical Trial."

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

and that **"safety was established"** to induce Plaintiffs and others to purchase millions of dollars of MabVax securities.

38.     MabVax commenced the second part of its clinical trial in November 2016 where the HuMab-5B1/MVT-5873 antibody was administered to patients in combination with the standard of care chemotherapy even though it had not yet established the Maximum Tolerated Dose of its antibody therapy and would not do so until the second quarter of 2017.

39.     The initial results in that "Phase 1b" or "Combination Trial" demonstrated even greater toxicity than the results from Phase 1a. Between late 2016 and early January 2017, the first three patients encountered a massive number of adverse events (24 in total) shortly after starting treatment. Seven of those Adverse Events were graded Grade 3 (Severe) or Grade 4 (Life Threatening)—most occurring within days of the commencement.

40.     The Adverse Events were so bad that the treatment of all three patients in the first patient-grouping was discontinued almost immediately after beginning. MabVax reduced the dosage of its antibody therapy administered to subsequent patients by a factor of eight in an attempt to protect the next cohort of patients from Severe Adverse Events.

41.     Reducing the dosage by such a large margin in the second cohort of the Phase 1b trial did not alleviate the safety problems, however. In early 2017, two of the first three patients treated with the reduced dosage in the combination trial (Phase 1b) developed Grade 3 (Severe) pneumonitis, an inflammation of lung tissue that had the potential to cause irreversible lung damage. Two more patients in a later patient grouping developed Grade 3 (Severe) and Grade 4 (Life Threatening) pneumonitis, causing MabVax to completely shut down its Clinical Trial.

42.     Though nearly all the initial cohorts of patients in the Phase 1b Combination Trial had suffered severe or in some cases life-threatening Adverse Events by the beginning of June

2017—which Defendants knew of—Defendants concealed those facts from Plaintiffs and other investors. They instead repeatedly touted in press releases and SEC filings throughout 2017 and 2018 that MabVax's antibody treatment was "well tolerated" by patients and that interim results were "positive" and "promising."

43.     Defendants knowingly and willfully misled the Plaintiffs about the interim results and progress of the Clinical Trial specifically to induce them to invest millions of Dollars into MabVax to keep it financially afloat and sustain Defendants' excessive compensation. From August 2017 to May 2018, Plaintiffs invested $3,154,700 in MabVax based upon and in reliance upon Defendants' material misrepresentations and omissions concerning the Clinical Trial.

44.     Even after MabVax was forced in 2018 to shut down the Clinical Trial due to the high prevalence of Severe Adverse Events patients repeatedly suffered, Defendants did not disclose it for months while they continued to (successfully) solicit further investment from Plaintiffs and others.

45.     When Defendants finally disclosed that fact in October 2018, they tried to hide the news by including a single sentence appearing on page 30 of a Quarterly Report that was belatedly filed with the SEC five months late—indicating that Defendants were aware of how troublesome this development was. This was in stark contrast to Defendants' and MabVax's prior (and consistently) misleading statements and public filings signed by Defendants that touted the results of the Clinical Trial as "positive" that they highlighted in numerous stand-alone press releases.

46.     Following that disclosure, MabVax was unable to raise any material financing, and within less than six months it filed for bankruptcy.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

by merging with an already-public company, Telik, Inc. ("Telik"), on July 8, 2014, in an all-stock

transaction that included the issuance to MabVax's existing shareholders and warrant-holders

preferred stock in the merged company and warrants to acquire additional shares of common

stock to be issued, among other things.

30.    While Telik had previously been listed on the NASDAQ stock exchange, it was

delisted effective as market open on July 10, 2014.

**C. Defendants Made Material Misrepresentations and Omissions Concerning Progress of MabVax's Phase 1 HUMab-5B1 Antibody Clinical Trial.**

*1. MabVax Required Continual Outside Financing.*

47. MabVax was a clinical stage company that had minimal revenue, but maximum

expenses. It required continual financing to remain a going concern until its therapy was either

sold or licensed to other companies, or until it otherwise progressed through three stages of

clinical trials until approved by the FDA so that it could reach the consumer market. If MabVax

ran out of financing, it would cease to exist. Defendants were always acutely aware of this

reality.

48. According to MabVax's Annual Report for the year ended December 31, 2015, at

the end of 2015 the Company only had approximately $4 million of cash and cash equivalents on

hand. In 2015, the Company had total operating expenses over $19 million, as well as reported

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

that it expected to continue losing money for "at least the next several years" and was dependent

on raising additional financing to fund operations. MabVax's own independent auditor stated in

its March 14, 2016 audit report that those "conditions raise substantial doubt about the

Company's ability to continue as a going concern."

49. It was therefore critical that Defendants issue a consistent stream of "good news"

about MabVax's efforts in order to successfully solicit additional necessary investment to fund

MabVax and Defendants' exorbitant salaries.

C2. The Importance of HuMab-5B1/MVT-5873 to MabVax's Viability.

50. MabVax's HuMab-5B1/MVT-5873 antibody therapy was at the center of its and

31. MabVax's HuMab-5B1 antibody was at the center of its and Defendants'' campaign to attract investors, including Plaintiffs.

51. On July 31, 2015, MabVax referred to HuMab-5B1it as its "'lead antibody development

program." In fact," MabVax stated in public filings between May and August 2016 stated that itMabVax was "

"subs

tantially dependent on the success of our product candidates, HuMab-5B1 and

~~89ZR-HuMab~~89ZR-

HuMab-5B1."

32 52. Defendants ~~repeatedly issued statements about and remained~~kept themselves constantly informed ~~regarding~~about the ~~then-current~~current status of ~~MabVax's HuMab-5B1 clinical trials.~~

MabVax's HuMab-5B1/MVT-5873 and repeatedly issued statements concerning the Clinical

Trial (many of which were misleading). From early 2016 until mid-2018, for example, Hansen

participated in meetings every other week during which the status of each patient in the Clinical

Trial was discussed in detail with the treating doctors.

33 53. Because the HuMab-5B1 ~~was MabVax's "~~/MVT-5873 therapy was MabVax's "lead antibody

development program,"~~"~~ Defendants knew ~~or should have known at all times material that~~that the Clinical Trial's results ~~from its HuMab-5B1 antibody trial in pancreatic cancer ("Phase I")~~ were material to

investors, including the Plaintiffs. MabVax's and Defendants' ~~34.~~ ~~MabVax's~~consistent release of updates ~~regarding the Phase 1 clinical trials for HuMab-5B1³ shows this to be the case because the Phase 1 results went directly to MabVax's~~

regarding the Clinical Trial while soliciting necessary investments to stay afloat show

Defendants' knowledge regarding its materiality to investors, as Phase 1 results directly went to

MabVax's ability to continue as a going concern. ~~Without positive Phase 1 data, MabVax would not be able to solicit future investment because MabVax would, in essence, never be reasonably expected to have a viable product.~~ The success or failure of the Phase 1 trial was ~~paramount to MabVax's~~

~~For example, MabVax released statements on December 1, 2015, January 28, 2016, March 18, 2016, March 21, 2016, and May 9, 2016.~~

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

financial success (and thus the success of any investment in the company); and any negative

therefore paramount to MabVax's success, and any negative results were

unquestionably absolutely material to all investors, including Plaintiffs.

all investors, including Plaintiffs. Without being able to tout positive Phase 1 data, MabVax

would be unable to solicit future investment because it would essentially mean that MabVax

would never have a viable product.

35 54.  As Hansen publicly acknowledged, any results, including interim results, from the Phase 1 trial    interim or

otherwise   Clinical Trial) were material to investors, including Plaintiffs. In an interview with "“Stock News

Now"” on August 22, 2016, which was published on YouTube on September 6, 2016, Hansen

stated the following regarding early interim results of the Phase 1 trial Clinical Trial:

> But we also thought that it was important to give patients and investors and
> potential partners an early glimpse into what we're we're seeing, provided that
> we're we're seeing something substantial and important, something that we can look
> back on and day say, "“yes we validated that".” And so we're we're looking for,
> somewhere in the third

uarter of this year, so not very far away, probably in the month of September, we think ~~we'll~~we'll have enough patients enrolled in each of those trials to say something about where we are and where ~~we're~~we're headed, and *we think those will be a very **important** sort of interim milestone*. (emphasis added)~~.~~

~~36.~~    ~~Hansen also acknowledged the importance of the results from the Phase 1 trial by~~

~~causing MabVax to publish them in public filings. In an S-1 filed on August 3, 2016, that Hansen~~

~~signed, MabVax stated the following regarding the Phase 1 results:~~

> ~~In the dose escalation portion of the trial, patients enrolled have locally advanced or metastatic pancreatic cancer who have failed other therapies. Nine patients treated to date have been observed as tolerating initial dosages of the drug reasonably well. Infusion reactions, which are not uncommon with protein drugs, have been the most frequent adverse events related to drug exposure and have been addressed by slowing the infusion rate. Of the nine patients who have been dosed to date, five have been treated for three or more months and investigator observations have noted stable disease for a subset of those patients.~~

~~37.~~    ~~As Defendants knew or should have known, although the HuMab-5B1 antibody~~

~~trial~~55.Defendants knew that although the Phase 1 results were material to ~~investors,~~ those without a sophisticated understanding of the both ordinary

~~science behind MabVax's antibody program, including Plaintiffs, had no basis to understand~~

~~whether these results were promising or catastrophic to MabVax's future. Because five of nine~~

~~patients that had "locally advanced or metastatic pancreatic cancer who ha[d] failed other~~

~~therapies" were apparently treated for "three or more months" with notations of "stable disease"~~

Plaintiffs believed that the results were positive—a reasonable belief given the circumstances.

38.    In a press release published on September 19, 2016, MabVax published further

Phase 1 results. Among other things, the press release stated:

"To date 13 patients, most with stage 3 and 4 metastatic pancreatic cancer, have been enrolled after having exhausted all other standard of care therapies," stated President and CEO J. David Hansen. "Based on assessments conducted with available unaudited data to date from these patients, we are seeing a pharmacokinetic profile for MVT-5873 that is similar to other monoclonal antibody therapeutics. We are actively dosing patients and plan on generating sufficient safety data in this portion of the phase I trial to allow the initiation, during the fourth quarter of this year, of the second part of the phase I trial where MVT-5873 will be administered in front line therapy in combination with a current standard of care chemotherapy."

39.    Again, as Defendants knew or should have reasonably expected, although the

Phase 1 results were material, ordinary investors including Plaintiffs had no basis other than

investors like Plaintiffs as well as and medically sophisticated investors, ordinary investors such

MabVax'sas Plaintiffs had no basis, other than MabVax's routine positive reporting, to understand whether

these results were promising or catastrophic to MabVax'sMabVax's future.

4056.    DefendantsThey accordingly knew or should have known that Plaintiffs would relyrelied on Defendants' public statements

entirely on Defendants' public statements and the analysis of sophisticated institutional investors

inwhen determining whether the Phase 1Clinical Trial results were, in fact, promising to MabVax'sMabVax's future. and that

Defendants also knew or should have known that Plaintiffs' continuing faith, and willingness to

Plaintiffs' continuing faith in and willingness to invest in MabVax, was predicated on Defendants' representations that the "promising" Phase 1

Defendants' representations that the interim results indicated the treatment was "safe" and

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

results"promising," and were indicative of the future health and profitability of MabVax. It was clear that negative

Phase 1that negative results of the Clinical Trial would cause significant financial hardship for MabVax.

D. The Oxford Loan

41.    Defendants knew or should have known that the state of MabVax's finances was

material to investors including Plaintiffs because MabVax was a "clinical stage" company.

42.    The amount of financing that an early-stage biotechnology company like MabVax

*3. MabVax's Disastrous Clinical Trial.*

57.    On December 1, 2015, Defendants, from and in California, caused MabVax from

California to file a Form 8-K with the SEC, which attached a MabVax press release from the

same day. In them, they announced that MabVax had filed an Investigational New Drug

Application ("IND") with the U.S. Food and Drug Administration ("FDA") for the HuMab-

5B1/MVT-5873 antibody as a therapeutic agent. They stated therein that, subject to FDA

acceptance, MabVax planned to initiate its Clinical Trial early in 2016, with Phase I proceeding

in two parts:

> The planned Phase I trial will evaluate the safety, tolerability and pharmacokinetics of HuMab 5B1 as a single agent or in combination with the current standard of care chemotherapy regimen in subjects with metastatic pancreatic cancer. The first cohort of patients to be enrolled in the planned clinical trial will be enrolled in a traditional dose escalation regimen to assess safety and determine the optimal dose

has
already secured is material to investors because such companies often do not generate any revenue (as Defendants will readily admit). Companies like MabVax thus rely on financing to keep them operating until their products are either sold or licensed to other companies or reach the consumer market. If such early-stage biotechnology company runs out of financing, it will likely cease to exist. Defendants, as experienced executives of a publicly traded early-stage biotechnology company, knew or should have known this.

43.   Because they knew or should have known that non-institutional investors who they actively solicited for investment (such as Plaintiffs) would rely on MabVax's public filings and the analysis of sophisticated institutional investors in determining whether the Phase 1 results were promising to MabVax's future, Defendants went to great lengths to conceal that its primary debt financier had refused to provide additional financing when requested because it believed the Phase 1 results to not be positive.

44.   According to a January 19, 2016 8-K, on January 15, 2016, MabVax and Oxford Finance LLC ("Oxford"), as collateral agent and lender, entered into a Loan and Security Agreement (the "Loan Agreement") that provided senior secured term loans to MabVax in an aggregate principal amount of up to $10,000,000, subject to the terms and conditions set forth therein.

45.   MabVax received initial funding of $5,000,000; but Oxford was not automatically bound to fund the second $5,000,000 tranche.

46.   Instead, the Loan Agreement permitted Oxford to decline funding the second $5,000,000 portion of the loan unless MabVax met two conditions: (a) MabVax was re-listed onto the NASDAQ Stock Market or New York Stock Exchange; and (b) MabVax received "positive interim data on the Phase 1 [trial]."

47.

MabVax's entitlement to the second tranche would expire on September 30, 2016.

48.     Oxford is a sophisticated institutional investor. As explained on its website:

For over 20 years, Oxford Finance has enjoyed a reputation for being far more than a lending institution. Our success is founded upon enduring relationships within an industry we know intimately well. Clients and partners alike value our deep expertise, our drive to share success, and the service and flexibility we have provided to hundreds of life sciences and healthcare services companies across the globe. In recent years, Oxford has originated over $6 billion in loans, with credit facilities ranging from $5 million to $150 million.

49.     Investors including Plaintiffs thus eagerly awaited news Oxford's decision

regarding whether to provide the second tranche of $5,000,000 to MabVax. If Oxford rejected

MabVax's request to fund the second tranche if and when asked, it would mean that, contrary to

MabVax's regular positive reports, "positive interim data on the Phase 1 trial" did not exist—an

indictment of MabVax's "lead antibody program" that would be catastrophic for the Company's

prospects and its ability to obtain future financing.

50.     Upon information and belief, Defendants knew or should have known at all times

material that investors, including Plaintiffs, awaited Oxford's decision and were prepared to rely

on it in either further investing in MabVax or refusing to invest and instead sell their shares.

                1. Defendants Made Material Misstatements and Omissions Concerning the
                Oxford Loan.

51.     MabVax met the first condition to pull down the second $5,000,000 tranche on

August 17, 2016, when it was re-listed on the NASDAQ Stock Exchange.

52.     Like any objectively reasonable investor, Plaintiffs thus expected that if Mabvax

requested this second tranche of the Oxford loan, it would be funded unless there was not

"positive interim data on the Phase 1."

53.     Around the same time as MabVax was re-listed, Defendants solicited additional

investment in MabVax through a Series F financing round.

54.     On information and belief, by the time Defendants solicited M. Brauser to invest, Defendants already knew that the Phase 1 results were not positive or that Oxford had rejected requests to fund the second $5,000,000 tranche.

55.     Crucially, in August 2016, Defendants already were representing to investors, including directly to M. Brauser, that the receipt of the second $5,000,000 tranche from Oxford was "a sure thing" despite being apprised of facts to the contrary not available to the public.

56.     Grander Holdings 401k purchased 207,900 shares of Series F Preferred Stock and warrants to purchase the same number of Common Stock from MabVax on or about August 17, 2016.

57.     On September 6, 2016, MabVax filed a presentation with the SEC that Hansen gave and which was attached to an 8-K that Hansen signed. It included a slide titled "Financial Information and Market Statistics" that showed MabVax's "Cap Table":

## Financial Information and Market Statistics

### Cap Table (In Mils)

| Before Financing | Pro Forma After | Remarks – All Numbers Stated Post-Reverse |
|---|---|---|
| 3.0 | 11.4 | Cash and cash equivalents !as of June 30. 20151 |
| 1.0 | 1.0 | Monthly burn rate |
| 5.0 | 5.0 | Debt • Oxford Finance LIE Before Second Tranche• |
| 4,235,339 | 5,641,350 | Common stock outstanding |
| | 324,722 | Most favored nations April 2015 PIPE financing |
| 2,165,190. | 2,165,190 | Common equivalents – Series D Preferred Stock¹ |
| 450.446 | 519,751 | Common equivalents – Series E Preferred Stock¹ |
| | 965,281 | Common equivalents – Series F Preferred Stock¹ |
| 6,950,975 | 9,316,299 | Total common and common equivalents |
| 1,199,505 | 5,124,144 | Total warrant shares |
| 9.87 $ | 6.64 | Average warrant exercise price (expire from Oct. 2017-Jan. |

Principal Stockholders! OPKO/Dr. Phil Frost. others 4.99% voting blockers. RTP Venture Fund Market Statistics;

| Market Cap: | $ | 28,714,472 | Based solely on common stock outstanding |
|---|---|---|---|
| Stare Price: | | 5.09 | Closing price on September 2, 2016 |
| Avg. Volume: | | 18,690 | Volume on Nasdaq August 19, 2016 |
| Ticker Symbol: | | MOVX | Nasdaq Capital Market |

¹ Issued fan 15, 2016, 4-yr term, int. only let yr, straight anion. Of principal next 3 yrs
    Series 0, E and F Preferred Stock include 4.99% voting blockers, no price resets or look back
provisions or special dividends, $UM per share liquidation preference

2.9

chm,

58.

The Cap Table showed MabVax having $3 Million cash and cash equivalents on hand as of June 30, 2016, "before financing" with a burn rate of $1 Million per month. After financing, the cash on hand rose to $11.4 Million. It further provided that MabVax had at that time $5,000,000 in debt from Oxford, but that was "Before Second Tranche."

59.     Three days prior  on September 3, 2016  MabVax and Defendants sent out a shareholder letter to investors that Hansen executed. They also included a copy of this letter in MabVax's 8-K, filed with the SEC on September 7, 2016. This letter stated unequivocally that as of September 3, 2016, MabVax had "12 months' operating capital to complete Phase 1 milestones."

60.     That statement was false in light of the figures set forth in the "Cap Table" unless MabVax had obtained or still could have obtained the additional $5,000,000 loan from Oxford because MabVax would have run out of operating capital before the twelve months that Hansen referenced in the shareholder letter had past.

61.     As a result, the most reasonable inference is that Hansen was clearly referring in his shareholder letter to the second tranche from Oxford. This is especially true because he also stated in the letter that MabVax had in place "all the ingredients required for long-term success and value creation for our stock."

62.     Defendants' deception concerning the Oxford Loan were not limited to the shareholder letter and "Cap Table;" and each misstatement and omission build on the prior one to the point that investors, including Plaintiffs, had no reason to believe anything other than that the second tranche was at all times material available to MabVax before September 30, 2016, when MabVax's contingent rights to draw down the second $5,000,000 would expire.

Case 1:20-cv-08618-AKH   Document 52   Filed 12/03/21   Page 8 of 42

63.     In an interview with "Stock News Now" on August 22, 2016, which was

published only days after the shareholder letter was transmitted on YouTube on September 6, 2016, Hansen (1) acknowledged the importance of MabVax's funding through Phase 1; and (2) stated that MabVax "certainly [could] pull down" the $5,000,000 loan from Oxford:

> We were able to finalize on 9.4 million dollars [in a recent equity raise], and so for us that's a substantial amount of money. If we combine that with our three million dollars that we had in our bank account at the end of the first quarter that's now 12, *plus we do have a debt financing arrangement in place with Oxford Finance and we* certainly *can pull down an additional five million dollars in debt financing here,* we hope in the next short period of time. *So that would certainly give us more than enough cash to reach our  what are considered to be our most important milestones  which are the end of the phase one clinical trials in the mid-term next year.* (emphasis added).

64.    Also, on September 13, 2016, Hansen caused an 8-K to be filed which included

an investor presentation titled, "Immuno-Oncology Products Discovered From the Human Immune Response to Cancer." Under the KEY HIGHLIGHTS section, Hansen stated the following material facts: (1) Uplist and interim data readout triggers $5M in additional debt financing from Oxford, and (2) Pull down expected fourth quarter.

65.    In early September 2016, Defendants met in person with representatives from

Oxford, during which meeting Defendants relayed the then-current interim data to Oxford and requested that Oxford fund the second tranche. Oxford reviewed the data that Defendants presented; and it declined to fund the second tranche on the basis of that data.

66.    At the time that MabVax and Hansen represented that MabVax "expected" to

"pull down" the second tranche in the "fourth quarter," he know or should have known that MabVax had either lost its right to such funds because Oxford had already rejected same or because the company would not be able to demonstrate "positive interim data on the Phase 1

[trial], as the loan documents required. His expectations were instead just a fantasy—which Hansen unquestionably must have known to be the case.

2.

**Defendants Concealed Oxford's Refusal to Provide the Second Tranche.**

67.    Between September 6, 2016, and September 30, 2016—the expiration date for the second tranche of the Oxford Loan—MabVax did not make any public statements regarding their request for the second $5,000,000 tranche from Oxford and Oxford's subsequent denial of such request.

68.    During this time, MabVax's and Defendants' misstatements and omissions misled Plaintiffs to mistakenly believe that MabVax could and would secure the second tranche of $5,000,000 from Oxford. Further, Plaintiffs had no idea that, upon information and belief, the Phase 1 results were in fact not positive, as MabVax and Defendants had only disclosed that material non-public information to Oxford.

69.    In fact, the first new public statement made by the Company regarding Oxford was not until November 7, 2016, in a 10-Q filing, almost *six weeks after the expiration date.* The Company's November 7, 2016 10-Q signed by both Defendants stated simply that:

> [t]he option to fund the second tranche of $5,000,000 . . . was upon the Company achieving positive interim data on the Phase 1 HuMab-5B1 antibody trial in pancreatic cancer and successfully uplisting to either the NASDAQ Stock Market or NYSE MKT on or before September 30, 2016. *The option for the Term B Loan expired on September 30, 2016.* The Company is not pursuing completion of any additional debt financing with Oxford Finance, LLC at the present time." In later filings, the Company stated only: "The option for the . . . Loan expired on September 30, 2016." (emphasis added)

70.    What MabVax and Defendants materially omitted from this statement and the others set forth below was—as they obviously knew given their participation in the meeting with Oxford—that MabVax had already attempted to secure the second tranche of $5,000,000; and Oxford had denied their request due.

71.    MabVax and Defendants concealed Oxford's rejection because, as an early-stage biotechnology company, Defendants knew that any kind of "bad press" would be disastrous to

Mab

Vax's ability to raise future funding. A sophisticated investor like Oxford rejecting the data on MabVax's "lead antibody development program" would be just that. Despite the positive reports in MabVax's public filings, Oxford clearly did not agree that there was "positive interim data" sufficient to provide the funding.

72.    MabVax and Defendants knew or should have known that this information was material to investors. Moreover, MabVax's and Defendants' statement that the loan "expired" was clearly intended to, and did, mislead Plaintiffs and other investors to believe that Oxford did not refuse to provide the second tranche. Plaintiffs, like other investors, were led to believe that Oxford did not reject MabVax. *This was not the case, however.* As MabVax and Defendants knew and the Plaintiffs later learned, a request was made and was rejected. Plaintiffs had a right to know this material information; but MabVax and Defendants purposely withheld it all the while soliciting additional investments from Plaintiffs.

73.    Moreover, in an email on April 3, 2017—over six months after Oxford rejected MabVax—Hansen represented directly to Brauser that "the positive results from our clinic programs are not an illusion" despite the lack of positive results regarding the HuMab-5B1 antibody trials and despite knowing that Oxford believed otherwise and properly refused to fund the second tranche of its credit facility for that express reason.

74.    Deprived by MabVax and Defendants of knowledge of Oxford's rejection of MabVax, Grander Holdings made additional investments in MabVax and the other Plaintiffs invested as well. Plaintiffs would not have made any of the following additional investments had they known that MabVax requested funding from Oxford and was denied:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $1,000,000 | 8/17/2016 |
| Grander Holdings | $350,000 | 5/2/2017 |

Case 1:20-cv-08618-AKH Document 62 Filed 12/03/21 Page 24 of 92

| Grander Holdings 401K | | $150,000 | 5/18/2017 |
|---|---|---|---|

| | | |
|---|---|---|
| Grander Holdings 401K | $250,000 | 8/21/2017 |
| M. Brauser | $250,000 | 9/14/2017 |
| M. Brauser | $249,700 | 9/22/2017 |
| M. Brauser | $200,000 | 10/10/2017 |
| Grander Holdings 401K | $250,000 | 2/6/2018 |
| Brauser Family Trust | $75,000 | 2/6/2018 |
| B. Brauser | $50,000 | 2/6/2018 |
| D. Brauser | $50,000 | 2/6/2018 |
| G. Brauser | $50,000 | 2/6/2018 |
| J. Brauser | $50,000 | 2/6/2018 |
| Grander Holdings 401K | $100,000 | 5/11/2018 |
| B. Brauser | $20,000 | 5/11/2018 |
| D. Brauser | $20,000 | 5/11/2018 |
| G. Brauser | $20,000 | 5/11/2018 |
| J. Brauser | $20,000 | 5/11/2018 |
| **TOTAL** | **$3,154,700** | |

75.    All of Plaintiffs' investments made after May 12, 2017, were made pursuant to a

series of public filings—many of which incorporate by reference several other publicly-filed

documents—that all contain the same material misstatement concerning the Oxford loan: "The

Option to draw the second $5 million expired on September 30, 2016."

76.    Defendants signed and caused MabVax to file with the SEC an S-1 on May 12,

2017, that states:

Effective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien covering substantially all of our assets, excluding intellectual property. As of December 31, 2016, we had an outstanding principal balance of $5 million. *The option to draw the second $5 million expired on September 30, 2016.*

(emphasis added).

77.    They caused MabVax to state the same information in several sections of the May

12, 2017 S-1:

**Oxford Loan**—On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC (the `Load [sic] and Security Agreement') providing for senior secured term loans to us in the aggregate principal amount

of up to $10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement. *The option to draw the*

second

d $5,000,000 expired on September 30, 2016." (emphasis added).

"On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC pursuant to which we had the option to borrow $10,000,000 in two equal tranches of $5,000,000 each (the `Loan Agreement'). The first tranche of $5,000,000 was funded at close on January 15, 2016 (the `Term A Loan'). The option to fund the second tranche of $5,000,000 (the `Term B Loan') was upon the Company achieving positive interim data on the Phase 1 HuMab- 5B1 antibody trial in pancreatic cancer and successfully uplisting to either the NASDAQ Capital Market or NYSE MKT on or before September 30, 2016. *The option for the Term B Loan expired on September 30, 2016."* (emphasis added).

78.     On July 14, 2017, Hansen and Hanson signed and MabVax filed an S-3 expressly stating that MabVax "filed with the Securities and Exchange Commission, and incorporate by reference," among other things, MabVax's Annual Report on Form 10-K for the fiscal year ended December 31, 2016, that similarly states:

Effective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien covering substantially all of our assets, excluding intellectual property. As of December 31, 2016, we had an outstanding principal balance of $5 million. *The option to draw the second $5,000,000 expired on September 30, 2016.*

(emphasis added)

79.     MabVax and Defendants then caused a prospectus supplement to be filed on September 13, 2017 that again provided:

Effective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien covering substantially all of our assets, excluding intellectual property. As of December 31, 2016, we had an outstanding principal balance of $5 million. *The option to draw the second $5 million expired on September 30, 2016.*

(emphasis added).

80.     Similarly, another prospectus supplement that Defendants caused MabVax to file dated October 11, 2017, provided:

Effective in January 2016, we entered into a $10 million loan and security agreement with Oxford Finance LLC, or Oxford Finance, that is secured by a lien covering substantially all of our assets, excluding intellectual property. As of

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

of the antibody. A second patient cohort will establish the safety and optimized dose of the antibody when administered with standard of care chemotherapy.

58.     The December 1, 2015, press release included a quote from Hansen in which he

described the filing of the IND as "a significant achievement for MabVax. Pending FDA

acceptance of the IND, we will begin the dose escalation portion of this Phase I trial as early in

2016 as possible and anticipate reporting on the early safety assessment and determination of a

Maximum Tolerated Dose in mid-year 2016. Achievement of this important interim milestone

will enable us to move into the combination therapy and monotherapy portions of the trial where

we could learn much more about the pharmacological effects of this new therapy."


December 31, 2016, we had an outstanding principal balance of $5 million. *The option to draw the second $5 million expired on September 30, 2016.*

(emphasis added).

81.     The Oxford Loan did not expire however... funding was denied.

82.     Defendants knew that Oxford *refused* to fund the critical loan. To wit, they

needed the funding to ensure receipt of their excessive salaries for the foreseeable future.

83.     Each of MabVax's and Defendants' foregoing statements thus materially omitted

that Defendants had not only requested the second $5 million tranche from Oxford, but that

Oxford rejected the request due to MabVax's insufficient Phase 1 data.

84.     As MabVax and Defendants must have known, these statements could and did

lead Plaintiffs to believe that MabVax's right to draw down the second $5,000,000 tranche of the

Oxford loan had simply expired rather than had been requested and rejected because the Phase 1

data was not positive.

8559.   Had MabVax andOn January 4, 2016, Defendants not omitted the material information that, in and from California, caused MabVax from

had requested the second tranche from Oxford and same was rejected, Plaintiffs never would

have purchased the securities they did because the ultimate disclosure of the negative results of

California to issue a press release announcing that it had received notice from the FDA

authorizing initiation of the Clinical trial.

60.   On March 21, 2016, Defendants, in and from California, caused MabVax from

California to issue a press release from its headquarters in California announcing that the

initiation of the Clinical Trial. The press release announced the primary objectives of Clinical

Trial was "to determine the safety, maximum tolerated dose (MTD), and the pharmacokinetics

(PK) of HuMab-5B1."

61.   The first part of the Clinical Trial (Phase 1a) was designed to determine the

the Phase 1 trials, specifically, and lack of progressMaximum Tolerable Dose for administration of the HuMab-5B1/MVT-5873 antibody programstanding

alone. To accomplish this, the initial protocol for Phase 1a required groups of three patients each

to be dosed at increasing levels of the antibody (e.g., 1mg per kg, then 2 mg per kg, then 3 mg

per kg, etc.). Patients were monitored weekly for adverse effects. If Dose Limiting Toxicities

were observed such as elevated liver function, that patient's dose would be reduced, his or her

treatment would be delayed, or treatment would be discontinued.

evidenced by Oxford's rejection, generally, negatively affected the value of the MabVax

securities they purchased once the market learned the truth.

86.   MabVax's and Defendants' material omission that Oxford had rejected its request

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

for $5 million is directly, causally, and foreseeably related to MabVax's bankruptcy and

Plaintiffs' loss. The fact that the Phase 1 results were not sufficient to secure the second tranche

of the Oxford loan demonstrates that MabVax was nowhere near creating a viable product and

would be unable to attract further investments, which was critical for MabVax's very survival.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

62.    The first two cohorts of three patients each (identified by MabVax collectively as cohort "A1") began treatment with the antibody at the dosage level of 1 mg per kg in February and March 2016.

63.    A subsequent cohort of three patients (cohort "A2") began treatment with the antibody at the dosage level of 3 mg per kg in April and May 2016.

64.    MabVax's treatment caused a materially-large number of these patients to experience adverse events almost immediately, including elevated liver function, hyperglycemia, hypoalbuminemia, anemia, vomiting and nausea. The nine patients enrolled in cohorts A1 and A2 encountered forty-four recorded Adverse Events.[4]

65.    Even worse, on information and belief, at least five of the initial nine patients (more than half) encountered Adverse Events that were diagnosed as "Grade 3." Under the CTCAE published by the US Department of Health and Human Services and utilized throughout the U.S. medical system, an Adverse Event is to be graded as "Grade 3" when it is "Severe or medically significant but not immediately life-threatening [or] hospitalization or prolongation of hospitalization indicated [or] disabling." An Adverse Event is to be graded as "Grade 4," when the Adverse Event presents "life-threatening consequences" indicating the need for "urgent intervention."

66.    As the dosage of antibody administered to patients increased during 2016, the number of Adverse Events patients suffered also increased.

67.    The six patients in Cohort "A5" who were administered antibody at the dosage of 2 mg per kg encountered twenty-five Adverse Events, with nine of those events graded as "Grade 3 – Severe." The six patients in Cohort "A6" who were administered antibody at the

---

[4] The adverse event data was reported in documentation that MabVax sent to a potential strategic partner it was pursuing during 2017.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

dosage of 3.0 mg per kg faced thirty-one Adverse Events, with five of them graded as "Grade 3 – Severe."

68.     The five patients in Cohort "A7" who were administered antibody at the dosage of 2.5 mg per kg faced forty-nine Adverse Events, ten of which were graded as either "Grade 3 - Severe," and "Grade 4 – Life Threatening."

69.     The six patients in Cohort "A6" who were administered antibody at the dosage of 3.0 mg per kg suffered thirty-one Adverse Events, with five of those events graded as "Grade 3 – Severe."

70.     In other words, MabVax's "lead antibody program" was not by any means safe for human administration.

71.     Throughout 2016 and into 2017, neither the Defendants nor MabVax disclosed to investors including Plaintiffs the prevalence of Adverse Events—including Severe and Life-Threatening Adverse Events—that patients enrolled in the Clinical Trial were suffering. As detailed below, Defendants instead repeatedly made affirmative misstatements that the treatment was "safe" and "well tolerated" by patients.

72.     The 32 patients who completed the initial dose-escalation/monotherapy portion of the Phase I trial encountered 172 Adverse Events. 31 of those events graded as Severe or Life-Threatening Adverse Events. In addition to Dose Limiting Toxicities, roughly half of the patients enrolled in Phase 1a encountered at least one Severe or Life-Threatening Adverse Event. Even among the patients who received the lowest antibody dosage of 1 mg/kg, twenty-five percent suffered a Severe Adverse Event. Defendants disclosed none of this data, and instead continued to affirmatively misrepresent that the treatment was "safe" and "well tolerated" by patients.

73.     Worse was the undisclosed number of patients with suspected Hy's Law cases.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Hy's Law provides that severity of liver injury can be determined following administration of a drug. This parameter is extensively monitored in clinical trials, including MabVax's, and post approval to prevent acute liver failure and death from liver failure.

74.　　As the FDA's Guidance on Drug Induced Liver Injury provides: "[F]inding one Hy's Law case is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe liver injury when given to a larger population."[5]

75.　　This FDA guidance usually pertains to large clinical trials involving hundreds to thousands of patients. It references a trial where two cases of Hy's Law in approximately 1,000 exposures caused the drug to not be approved. The prevalence of Hy's Law in patients in MabVax's Clinical Trial were, by comparison, many multiples higher: seven suspected cases of Hy's Law in just thirty-eight patients.

76.　　In late spring or early summer 2016, 2 of the 3 patients in the 3mg per kg cohort of the initial dose-escalation/monotherapy clinical trial had experienced Severe Adverse Events, of which Defendants were aware.

77.　　It was not until a June 5, 2017, press release that MabVax publically stated it had determined that the Maximum Tolerable Dose for its antibody in humans was 1mg per kg. "Maximum Tolerable Dose" is defined in medical literature as the highest dose of a drug or therapy that does not cause unacceptable side effects or toxicity.

78.　　Well before the Phase 1a dose-escalation portion of the Clinical Trial was completed, however, and before the Maximum Tolerable Dose was determined, Defendants caused MabVax to rush out a press release boasting of "Interim Safety and Imaging Results" from the Clinical Trial.

---

[5] *Guidance for Industry Drug-Induced Liver Injury: Premarketing Clinical Evaluation*. US Food and Drug Administration (2009), at p. 5. Available at https://www.fda.gov/media/116737/download

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

79.      In November 2016, MabVax had obtained data on only half the patients who

ultimately would complete the Phase 1a portion of the Clinical Trial.

80.      Despite Phase 1a of the Clinical trial being far from completed, on November 14,

2016, Defendants caused MabVax to issue a press release from its headquarters in California that

was filed as an exhibit to a Form 8-K with the SEC boasting of "Interim Safety Results" from the

Clinical Trial. Its headline stated: "Sufficient safety established to initiate the evaluation of

MVT-5873 as a front-line therapy in combination with a standard of care chemotherapy." The

press release further stated:

> The MVT-5873 phase I clinical trial initiated in February 2016 is designed to
> establish safety and determine the recommended phase II dose (RP2D) for
> MVT-5873 as both as monotherapy (Part 1 of the trial), and in combination with
> standard of care chemotherapy (Part 2) using nab-paclitaxel plus gemcitabine.
> Initiation of Part 2 requires establishing three safe dose levels for MVT-5873 as
> monotherapy in patients with relapsed or refractory locally advanced or metastatic
> pancreatic cancer. The Company reports that the safety of MVT-5873 has been
> established at three incremental dose levels by treating 16 patients at three clinical
> sites. While patients continue to be recruited to establish the RP2D, the Company
> also reports that Part 2 of the clinical trial is now open and will include patients
> with previously untreated pancreatic cancer receiving a standard of care
> chemotherapy as defined in the protocol.
>
> To date, the study has consented 28 subjects with 3 in screening, 9 screen failures,
> and 16 subjects treated. . . .

81.      The November 14, 2016, press release was materially false and misleading. While

it is correct that as of November 14, 2016, MabVax had indeed dosed patients at three

incremental dose levels (1mg per kg, 2 mg per kg, and 3 mg per kg) the treatment was not "safe"

when administered at all those dosage levels. Only the lowest dose did not lead to dose-limiting

toxicities requiring reduced dosing, delayed dosing, or discontinuation of therapy. And even at

that dose, numerous adverse events were noted including five Grade 3 Severe Adverse Events.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page of 42

82.     Dosage at the higher levels caused a materially large number of Severe or Life-

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Threatening Adverse Events in patients. MabVax itself conceded (but not until June 5, 2017) that 1 mg per kg was the Maximum Tolerable Dose of its HuMab-5B1/MVT-5873 antibody therapy. Given the large number of Severe Adverse Events associated with higher doses, any dose higher than 1 mg/kg was clearly unsafe and Defendants knew that to be the case.

83.     Defendants also caused MabVax to announce in the same November 14, 2016, press release that based on the results from the incomplete dose-escalation phase of the trial, MabVax had opened the Phase 1b "Combination Therapy" portion of the trial, where its antibody would be administered along with standard of care chemotherapy.

84.     The early results from the Combination Trial were even worse than the prior phase. The first cohort of the Combination Trial enrolled three patients, who commenced treatment from mid-November to mid-December 2016. All three encountered a materially large number of Adverse Events; twenty-one in total, four of which were Grade 3 (severe) and one Grade 4 (life threatening). The Severe Adverse Events principally involved elevated liver function. These patients' elevated liver function tests remained high for several weeks; they did not "resolve in days" as MabVax later claimed.

85.     Two of the three initial patients in the Combination Trial were at high risk of a fatal drug-induced liver injury in accordance with Hy's Law.

86.     Numerous studies have shown that the incidence of Grade 3 or worse liver injury in patients treated with gemcitabine and nab-paclitaxel alone is less than 5%. By comparison, in the first cohort of patients who were administered gemcitabine and nab-paclitaxel in combination with MabVax's antibody, the incidence of Grade 3 liver injury *was 100%!*

87.     In short, the combination of MabVax's antibody with the gemcitabine and nab-paclitaxel chemotherapy standard of care was highly toxic to the first three patients. They all

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

were pulled out of the treatment within a matter of weeks and by February 7, 2017, at the latest.

88.     Based on the results of the first cohort in the Combination Trial, the doctors treating patients decided to reduce the dosage of antibody administered to the second cohort of the Combination Trial *eightfold*. Specifically, dosage was reduced from 1 mg per kg to 0.125 mg per kg—a miniscule does that may not have even been efficacious.

89.     Both Defendants were aware in early 2017 about the initial poor results of the Combination Trial and the decision to drastically reduce the dosage of antibody provided to subsequent patients due to the prevalence of Severe Adverse Events.

90.     The substantial reduction in antibody dose for patients in the Combination Trial began in early January 2017. Defendants failed to disclose that material fact for almost ten months all while continually soliciting further investment from Plaintiffs. In fact, the first mention of it was in an October 31, 2017, press release that omitted to mention that the dosage noted had been reduced from 1.0 to 0.125 and similarly omitted that the reason for the massive reduction was due to the serious liver toxicity encountered by the first three patients.

91.     The second three-patient group in the Phase 1b Combination Trial commenced treatment (at the much lower dosage level) on January 16, March 29 and May 8, 2017. While instances of elevated liver function was reduced, two of these three patients nonetheless developed a pneumonitis prior to June 2017, both at a "Grade 3 – Severe" level. Pneumonitis is the inflammation of lung tissue that has the potential to cause irreversible lung damage. Treatment of all three patients in the second cohort of the Combination Trial was completed on or before June 7, 2017.

92.     Thus: Of the first six patients who participated in the Combination Trial, the first three all encountered severe liver toxicity, requiring delay or discontinuation of their treatment.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

MabVax materially omitted this information, which ultimately led to its bankruptcy.

87.     MabVax's and Defendants' omission that their second loan request had been rejected by Oxford pertained to the very risk that was concealed by this omission. In other words, MabVax's and Defendants' omissions concealed facts that, when fully disclosed, negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

E. Defendants Misrepresented That They Would Take Pay Cuts

The second three were treated with a drastically reduced dosage of the antibody; but despite that precaution, two of them encountered Grade 3 pneumonitis. Most if not all of those Severe Adverse Events were encountered by May 2017 and were known by Defendants.

93.     Despite knowing that five of the first six patients in the Phase 1b Combination Trial (83%) had encountered Grade 3 or 4 Adverse Events, the Defendants nonetheless caused MabVax to issue multiple public statements announcing that the results for the first six patients in the Combination Trial were "positive" and "promising, as well as that the treatment was "safe," and "generally well tolerated." That patients had to discontinue therapy and receive intervention negates the possibility that treatment was "well tolerated."

94.     MabVax did not enroll any additional patients in the Clinical Trial until in late 2017.

95.     MabVax's financial situation in 2017 and 2018 and its continued viability were uncertain without raising additional capital. Had MabVax not obtained outside funding from Plaintiffs, it would have collapsed, and Defendants likely would have lost their jobs (and their exorbitant compensation packages also).

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

88~~96~~.   ~~Despite the foregoing~~In 2017, while MabVax's ability to continue as a going concern was continually up in the air and the Clinical Trial was producing horrific results regarding safety, Defendants used shareholders'~~'~~ money, including Plaintiffs'~~'~~, to cause MabVax to compensate them over $~~1.45~~3 million in salary, bonus, equity, and other compensation ~~in 2016:~~.

97.   MabVax would not have had the funds to pay Defendants this exorbitant compensation had it and Defendants not withheld material information to induce Plaintiffs to make investments during 2017.

98.   The material misrepresentations and omissions did not end there.

| 2016 EXECUTIVE COMPENSATION | | | | | | |
|---|---|---|---|---|---|---|
| ~~Name~~ | ~~Salary~~ | ~~Bonus~~ | ~~Stock~~ | ~~Options~~ | ~~Other Comp~~ | ~~Total~~ |
| ~~J. David Hansen~~ | ~~$418,438~~ | ~~$141,400~~ | | ~~$393,70~~ | ~~$35,717~~ | ~~$989,257.00~~ |
| ~~Gregory P. Hanson~~ | ~~$276,014~~ | ~~$62,790~~ | | ~~$99,743~~ | ~~$15,055~~ | ~~$453,602.00~~ |

~~89.   While continuing to mislead investors regarding Oxford's refusal to fund the Second Tranche and causing MabVax to pay themselves excessive compensation, Defendants made further misrepresentations related to their compensation in part to obtain even more investments from Plaintiffs and others largely to fin the very compensation they had promised to reduce.~~

~~90.   In April of 2017, Grander Holdings, Grander Holdings 401k, and M. Brauser were considering additional investments into MabVax. Defendants' employment agreements were set to terminate on July 1, 2017.~~

~~91.   With that deadline in mind, in April 2017, Defendants promised that they would take pay cuts in their renewed employment agreements. However, Defendants knew at the time~~

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

that they made this promise that they would not be taking any pay cuts

99. According to sworn testimony by defendant Hansen, in "early 2018" a third

participant in the Clinical Trial developed pneumonitis. MabVax's former Vice President of

Pharmaceutical Development, Paul Maffuid, has testified under oath that this third incidence of

pneumonitis was so "serious" in nature that MabVax had to notify the FDA and MabVax was

forced to revise the enrollment bulletin sent to doctors considering enrolling patients in the

Clinical Trial. Neither Defendants nor MabVax disclosed those facts to Plaintiffs or other

investors, however.

100. A *fourth* participant in the Clinical Trial also developed pneumonitis. MabVax

decided to completely shut down the Clinical Trial, stop any ongoing treatment of patients, and

cease enrolling patients in the Clinical Trial because of the four patients having developed

"Severe" pneumonitis.

101. Defendants, of course, did not disclose the cessation of the Clinical Trial until

October 15, 2018. While discovery will pinpoint precisely when the decision was made to shut

down the trial; however, on information and belief, cases of pneumonitis began to surface in late

2016 and early 2017. Defendants not only knew about, but also intentionally failed to disclose

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

anything about those cases for at least a year, and the Clinical Trial was suspended months

before any disclosure was made.

*4. Defendants' Specific Materially Misleading or False Statements and Omissions from August 2016through November 14, 2016.*

~~92~~102.   ~~With~~ Defendants~~' promise to reduce their compensation after their employment~~ made misleading statements and caused MabVax to issue misleading

press releases concerning the progress of the company's Phase 1 HuMab-5B1 Clinical Trial.

The HuMab-5B1 antibody was MabVax's key asset, on which the Company's prospects heavily

~~agreements terminated as the backdrop, MabVax sought additional private investment through a~~

~~Series G financing round and a Series H financing round.~~

~~93.   As Defendants knew, M. Brauser—who controls Grander Holdings—was made~~

~~aware of this promise. In fact~~relied; and because of that, Defendants ~~intended that their promises to reduce their~~caused MabVax to issue misleading press releases

concerning the progress of the company's Clinical Trial. Failure of the Phase 1 HuMab-5B1

~~compensation be communicated to M. Brauser and for Plaintiffs to rely thereupon.~~

~~94.   Hansen laid out the 2017 budget in writing, stating where they could eliminate~~

~~other costs and defer payments including the promised cuts in his and Hanson's compensation.~~

~~95.   In reliance on the foregoing promise, as well as other material misrepresentations~~

~~and omissions set forth herein, Grander Holdings 401K purchased 85,714 shares of Series G~~

~~Preferred Stock and Grander Holdings purchased 200 shares of Series H Preferred Stock.~~

~~96.   In fact, only two months later, on July 3, 2017, the Defendants caused MabVax~~

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

announce in an 8-K, signed by Hansen in California, that they extended their lavish employment

agreements on nearly identical terms to their previous employment agreements:

> On July 1, 2017, MabVax Therapeutics Holdings, Inc. (`Company') entered into
> renewed employment agreements with each of J. David Hansen, its Chairman,
> President and Chief Executive Officer, Paul W. Maffuid, Ph.D., its Executive
> Vice President of Research and Development, and Gregory P. Hanson, CMA,
> MBA, its Chief Financial Officer (the `Employment Agreements'). The principal
> purpose of each of the Employment Agreements was to extend the term of each
> of Mr. Hansen's, Dr. Maffuid's and Mr. Hanson's (the `Executives') employment
> through July 1, 2020 as previously entered into employment agreements
> terminated or will terminate on July 1, 2017, July 21, 2017 and July 1, 2017,
> respectively. These agreements supersede and replace the Employment
> Agreements between the Company and each of Mr. Hansen and Mr. Hanson
> dated July 1, 2014 and the Employment Agreement between the Company and
> Dr. Maffuid dated July 21, 2014 (the `Prior Agreements') and contain
> substantially the same terms as the Prior Agreements except as set forth below.

97.    There were no material pay cuts.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Clinical Trial was highly likely to impair Defendants' ability to raise capital to continue funding MabVax and their excessive personal compensation.

103. In a June Corporate Presentation that was attached as an Exhibit to a June 15, 2016, Form 8-K SEC Filing made in and from California, Hansen touted the efficacy of the HuMab-5B1/MVT-5873 antibody in laboratory tests, but at dosages in excess of 3mg per kilogram (the highest dosage level MabVax's Clinical Trial tested). Specifically, it touted a 33% reduction in tumor growth in laboratory tests compared to the control group (which received standard of care chemotherapy) after 42 days of administering the HuMab-5B1/MVT-5873 antibody at 5mg per kg, a 39%.

104. In August 2016, Defendants, on information and belief while in California, specifically orally represented to M. Brauser (the President of the Grander Holdings401K Plan Administrator) that the Clinical Trials had delivered "promising" results and were "positive." These representations were materially false and misleading because Defendants failed to disclose that patients had already exhibited Adverse Events and that 2/3 of the cohort at the 3mg per kg level had experienced Severe Adverse Events. In doing so, Defendants omitted statistically significant evidence of Adverse Events which effect the commercial viability of the HuMab-5B1/MVT-5873 antibody given that Defendants had been touting the efficacy of same in tests at levels beyond the Maximum Tolerable Dose.

105. In an August Corporate Presentation that was attached as an Exhibit to another Form 8-K Filing that was made from California, Hansen again touted the efficacy of the HuMab-5B1/MVT-5873 antibody in laboratory (non-human) tests, but in dosages that far exceeded the 3mg per kg dose that had already produced Severe Adverse Events in 2/3 of the human test subjects without disclosing that important fact. In fact, the data presented was the same as he had

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

presented in June. By August 2017, however, he, MabVax, and Hanson were all aware that the Maximum Tolerable Dose was substantially lower. This omission made the August presentation misleading because it promoted the efficacy of a treatment at dosage levels that could not be safely administered in humans.

106. Whether the MabVax's HuMab-5B1/MVT-5873 antibody could be safely administered at efficacious levels was material. Deprived of the knowledge that 2/3 of the 3mg per kilogram cohort had experienced Severe Adverse events at a dosage level that was twice the Minimum Tolerable Dose and that was 40% lower than the levels, M. Brauser caused Grander Holdings 401K to invest $1,000,000 in MabVax on August 17, 2016.

107. Had Defendants not misrepresented and omitted material information, it would not have made that investment.

*5. Defendants' Specific Material Misleading or False Statements and Omissions from August 17, 2016, through May 5, 2017.*

108. On November 14, 2016, Defendants, from and in California, caused MabVax from California to issue a press release from its headquarters in California, which press release was simultaneously filed as an exhibit to a Form 8-K with the SEC, purporting to report "Interim Safety Results" from the Phase I Clinical Trial. The press release was headlined with a statement that "Sufficient safety established to initiate the evaluation of MVT-5873 as a front-line therapy in combination with a standard of care chemotherapy." The press release further stated:

The MVT-5873 phase I clinical trial initiated in February 2016 is designed to establish safety and determine the recommended phase II dose (RP2D) for MVT-5873 as both as monotherapy (Part 1 of the trial), and in combination with standard of care chemotherapy (Part 2) using nab-paclitaxel plus gemcitabine. Initiation of Part 2 requires establishing three safe dose levels for MVT-5873 as monotherapy in patients with relapsed or refractory locally advanced or metastatic pancreatic cancer. The Company reports that the safety of MVT-5873 has been established at three incremental dose levels by treating 16 patients at three clinical sites. While patients continue to be recruited to establish the RP2D, the Company also reports

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

that Part 2 of the clinical trial is now open and will include patients with previously untreated pancreatic cancer receiving a standard of care chemotherapy as defined in the protocol.

(emphasis added)

109. The November 14, 2016, and Form 8-K filed on the same day were materially false and misleading. While it was correct that as of November 14, 2016, MabVax had dosed patients at three incremental dose levels (1, 2, and 3 mg per kg) only one of those dosage levels was "safe." It was not true that "safety" had been established at each of those dosage levels.

110. Further, although MabVax had "open[ed]" Phase 1b of the Clinical Trial, the stated precondition for that event (establishment of three safe dose levels) had not been achieved, contrary to the implication of that press release. As of that date, dosage at the levels of 2 mg per kg, and 3 mg/kg had caused patients to encounter a large number of Severe Adverse Events. Even at 1 mg per kg, numerous Adverse Events had been noted, including several Grade 3 (Severe) Adverse Events.

111. On December 7, 2016, Defendants, from and in California, caused MabVax from California to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck that had been provided to some investors. The presentation contained a slide representing that a "Positive" milestone had been achieved in the HuMab-5B1/MVT-5873 Clinical Trial. Specifically, it provided: "Early safety established at interim milestone readout in November" and "Early safety and tolerability established in 16 patients treated in three escalating dose cohorts."

112. The December 7, 2016, Form 8-K filing was materially false and misleading because MabVax had not achieved safety and tolerability of its HuMab-5B1/MVT-5873 antibody therapy "in three escalating dose cohorts" for the reasons set forth above. And even

then, there were several Grade 3 Severe Adverse Events. Only one of those dosage levels might reasonably be considered "safe."

113. On February 13, 2017, Defendants, from and in California, caused MabVax from California to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck that had been presented at the BIO CEO 2017 Investor Conference. The presentation contained a slide containing the following statements:

◆ **MVT-5873 Summary and Opportunity**
  – Efficacy signals from initial monotherapy phase I trial in stage 3 and 4 pancreatic patients very encouraging
  – Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)
  – Most dosage levels tolerated reasonably well with most AEs transient elevations in LFTs.

114. The statement in the February 13, 2017 Form 8K that "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)," was materially false and misleading because it omitted to state that dosage levels above 1 mg per kg were unsafe and exceeded the Maximum Tolerable Dose for the HuMab-5B1/MVT-5873 antibody. The statement that "most dosage levels tolerated reasonably well" was also materially false and misleading because any dosage levels of the HuMab-5B1/MVT-5873 antibody above 1 mg per kg were not tolerated "reasonably well." They instead caused patients to suffer dozens of Severe or Life-Threatening Adverse Events. In addition, these doses led to numerous dose-limiting toxicities requiring dose reduction, delay, or discontinuation of treatment.

115. On March 1, 2017, Defendants, from and in California, caused MabVax from California to file an Annual Report on Form 10-K for the fiscal year ended December 31, 2016. That Form 10-K was signed by both Defendants Hansen and Hanson in California. Both Defendants Hansen and Hanson signed and filed with the SEC separate certifications pursuant to Section 302 of the

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Sarbanes-Oxley Act of 2002 attesting that they each had (a) reviewed MabVax's Annual Report on Form 10-K, and (b) based on their respective knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

116. MabVax's Annual Report on Form 10-K for the fiscal year ended December 31, 2016, stated in part that "the safety of MVT-5873 had been established at three incremental dose levels by treating 16 patients at three clinical sites." This statement was materially false and misleading for the reasons set forth above.

117. On March 31, 2017, Defendants, from and in California, caused MabVax from California to file with the SEC a Current Report on Form 8-K, which attached an updated MabVax corporate slide deck. The presentation contained a slide containing the following statements: "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg);" and, "most dosage levels tolerated reasonably well with most AEs transient elevations in LFTs."

118. The statement in the slide presentation filed with the March 31, 2017, Form 8-K that "Dosage levels required to achieve stable disease are modest (1 to 3 mg/kg)," was materially false and misleading because it omitted to state that dosage levels above 1 mg per kg were unsafe and exceeded the Maximum Tolerable Dose for the HuMab-5B1 (MVT-5873) antibody. The statement that "most dosage levels tolerated reasonably well" was also materially false and misleading because any dosage levels of the HuMab-5B1/MVT-5873 antibody above 1 mg per kg was not tolerated "reasonably well," but rather caused patients to suffer dozens of Severe Adverse Events causing dose-limiting toxicities and requiring patients delay or reduce dosing or discontinue treatment. In addition, the statement "transient elevations in LFTs" is false. While

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

some LFTs returned to ≤ Grade 1, many patients continued to have elevated LFTs for several

weeks to months. Defendants and MabVax later stated in a June 5, 2017 press release that 1 mg

per kg was the Maximum Tolerable Dose of its HuMab-5B1 (MVT-5873) antibody. Even assuming that 1 mg/kg in the Phase 1a (monotherapy) trial could be characterized as "safe" (which is far from clear), the higher dosages certainly could not be so described. Dosage above 1 mg/kg was unsafe. Additionally, the statement "most [Adverse Events] [were] transient elevations in [Liver Function Tests]" was false or misleading. On information and belief, most patients' elevated Liver Function Tests were not "transient." While some patients' Liver Function Tests declined fairly quickly, many patients continued to have elevated results for several weeks to months.

119. On May 5, 2017, Defendants, from and in California, caused MabVax from California to file with the SEC an Amended Registration Statement on Form S-1/A in connection with an offering of MabVax Series G Convertible Preferred Stock. That Form S-1/A was signed by both Defendants in California. The Prospectus Summary section of the Form S-1/A reported on the status of MabVax's Clinical Trial, stating the following:

"[T]he safety of our HuMab-5B1 antibody designated as MVT-5873 had been established at three incremental dose levels in our phase I clinical trial . . . Patients continue to tolerate the study drug reasonably well with drug infusion reactions being the most common adverse event which is adequately addressed by slowing the infusion rate and use of routine premedication. Increases in liver function tests are seen early in a minority of patients and appear reversible."

120. These statements were materially false and misleading because as of the date they were made, MabVax had not achieved safety of its HuMab-5B1/MVT-5873 antibody "at three incremental dose levels," and the treatment was not "reasonably well" tolerated. MabVax had by this time dosed patients at four incremental dose levels, but only the 1 mb per kg level did not have dose limiting toxicities associated with it although there were several Grade 3 Severe Adverse Events; meaning only one (not all) of those dosage levels *might* be considered "safe." The additional statement that increases in liver function tests were seen in a "minority" of

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

patients was patently false. To the contrary, as set forth above, a large majority of patients in the Clinical Trial—80% or higher—had suffered from increases in liver function tests. Given the number of Severe Adverse Events that had already been associated with higher doses by the time of this May 7, 2017 statement, "safety" had not by any means "been established at three incremental dose levels."

121. During early 2017, Defendants solicited Plaintiffs to purchase MabVax securities. Based upon the representations detailed above, Defendants fraudulently induced Plaintiffs to believe that MabVax's Clinical Trial was going well, that interim results were only positive, and that patients were tolerating the treatment well. Plaintiffs believed, as was represented to them, that their investments would be used to fund the Clinical Trial. Instead, the investments were used to fund Defendants' compensation.

120. However, Defendants knew well before then that patients in the Phase 1a "Monotherapy" portion of the Clinical Trial had encountered a disturbingly large number of Severe Adverse Events, principally liver toxicity. At the same time, Defendants also knew that the initial results from the Phase 1b "Combination Therapy" portion of the Clinical Trial were even worse, with severe liver toxicity that persisted as well as pneumonitis at Grade 3 – Severe pneumonitis.

121. Plaintiffs' investments in May 2017 and thereafter were made pursuant to MabVax's publicly filed S-1 with the SEC, which was signed by both Hansen and Hanson in California on May 5, 2017 and filed on May 12, 2017. However, it omitted material information that induced the Plaintiffs to invest.

122. In reliance upon Defendants' false and misleading statements identified in paragraphs 191 through 205 above, Grander Holdings invested $350,00 in MabVax on May 2,

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page- of 42

2017.

123. Had Defendants not misrepresented and omitted material information, it would not have made that investment.

*6. Defendants' Specific Material Misleading or False Statements and Omissions from May 5, 2017, through October 11, 2017.*

98.    According to the July 3, 2017 8-K, Hansen's base salary was set at $430,000, with bonus eligibility "[u]p to 50% of Base Salary," and Hanson's base salary was set at $310,000, with bonus eligibility "[u]p to 50% of Base Salary." According to an April 2, 2018 10-K, Hansen's base salary in 2016 was $418,438, and Hanson's base salary was $276,014. The April 2, 2018 10-K further shows that Defendants received these full amounts. Hansen's base salary for fiscal year 2017 was $427,876. Hanson's base salary for fiscal year 2017 was $309,312. *See April 2, 2018 10-K at 52.*

99124. On July 3May 22, 2017, another investor known to Defendants to relay material, in and from California, caused MabVax from California to file a Quarterly Report on Form 10-Q for the quarter ending March 31, 2017 (the "Q1 2017 Form 10-Q"). That Form 10-Q was signed by both Defendants in California. Both Defendants signed and filed with the SEC separate certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 attesting that they each had (a) reviewed the report, and (b) based on their respective knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

125. In reporting on the interim results of the HuMab-5B1/MVT-5873 Clinical Trial, MabVax's Q1 2017 Form 10-Q reported in part that:

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

the safety of our HuMab-5B1 antibody designated as MVT-5873 had been established at three incremental dose levels in our phase I clinical trial. . . . After establishing the current dosage safety level for MVT-5873 in Part 1 of the trial, we were able to initiate part 2 of our phase I study. Part 2 combines MVT-5873 with a standard of care chemotherapy regimen in newly diagnosed treatment naïve patients. . .

As of April 2017, we had enrolled 29 patients in Part 1 of our phase I trial at three clinical sites. Twenty-five patients are currently evaluable.

**Patients continue to tolerate the study drug reasonably well with drug infusion reactions being the most common adverse event, which is adequately addressed by slowing the infusion rate and use of routine premedication.** Increases in liver function tests are seen early in a minority of patients and appear reversible.

(emphasis added).

information to M. Brauser and others, emailed Hansen: "I was surprised to see this filing. It was my understanding that there were going to be pay cuts until the company was fully funded." Hansen responded the next day, copying Hanson, and did not deny that those cuts were discussed, and instead stated:

Management agreements expired July 1. If either the employee or the company did not renew, then the whole management team is terminated and severance compensation kicks in. Management is meeting weekly with the board to discuss all expense forecasts and capital raising efforts. The board is monitoring all compensation and related expenses closely.

100. Had Defendants not misrepresented that they would that they would take pay cuts in their renewed employment agreements, Plaintiffs would not have made the May 2017 securities purchases they did make as the continued payment of excessive compensation packages negatively affected the value of the MabVax securities they purchased.

101. Defendants' material misstatements concerning their promise to reduce their compensation at a time when MabVax was starved for cash directly, causally, and foreseeably related to MabVax's bankruptcy and Plaintiffs' loss.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

F.     Defendants   Make   Further   Material   Misrepresentations   Regarding   Their Employment Agreements

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

126. These statements in MabVax's Q1 2017 Form 10-Q were materially false and misleading. As of the filing date, MabVax had not achieved safety of its HuMab-5B1/MVT-5873 antibody "at three incremental dose levels," and the treatment was not "reasonably well tolerated" and it was false that increases in lever function tests were seen only in a "minority of patients," for the reasons set forth above.

127. MabVax's Q1 2017 Form 10-Q was also materially false and misleading because it omitted that by that time at least five six patients in its Phase 1b/Combination Trial had suffered Severe Adverse Events, including liver toxicity and two cases of pneumonitis. It was further false and misleading in stating that "after establishing the *current* dosage safety level for MVT-5873 in Part 1 of the trial, we were able to initiate part 2 of our phase I study," while omitting to mention that, due to the high rate of Adverse Events suffered from the first cohort of patients enrolled in "part 2 of our phase I study," the dosage level for subsequent patients had to be reduced eight-fold, from 1 mg per kg to 0.125 mg per kg. (emphasis added)

128. In fact, it was not until a June 5, 2017, press release that MabVax publically stated it had determined that the Maximum Tolerable Dose for its antibody in humans was 1mg per kg.

129. Between May and August 2017, Defendants knew that patients in the Phase 1a "Monotherapy" portion of the Clinical Trial had encountered a disturbingly large number of Severe or Life Threatening Adverse Events, principally liver toxicity and that the initial results from the Phase 1b "Combination Therapy" portion of the Clinical Trial were even worse given that at least five of the first six patients in the Phase 1b Combination Trial (83%) had encountered Grade 3 or 4 Adverse Events, a remarkably high number.

130. Despite that knowledge, during May-August 2017, Defendants solicited Plaintiffs to purchase additional MabVax securities, which they did. Based upon the representations

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

detailed above, Defendants fraudulently induced Plaintiffs to believe that MabVax's Clinical Trial was going well, that interim results were only positive, and that trial patients were tolerating the treatment well.

131. In August 2017, MabVax was again running out of cash to operate its business, and the Clinical Trial was not going well. MabVax only had enough money to last until late September or early October 2017. Moreover, its entire clinical operations department had quit, three of the Company's five executives had given notice that they were quitting, certain vendors were refusing to provide further services until their accounts were brought current, and the Company had no money to enroll additional patients in the Clinical Trial.

132. At a MabVax Board of Directors meeting on or about August 27, 2017, Defendant Hansen presented a plan to wind down the Company. The broad outline of the plan was for the Company to cut expenses to the bone, retain an investment banker to market all of MabVax's assets for potential sale, and then with the expectation that all assets would be sold by the end of 2017, to then sell off or reverse merge MabVax's corporate shell.

133. On September 6, 2017, MabVax announced that it had engaged Greenhill & Co., an independent investment bank, to serve as a financial advisor to assist MabVax in exploring and evaluating strategic options with the goal of maximizing shareholder value. The release quoted Defendant Hansen stating, "As part of our ongoing evaluation and prioritization of our portfolio of assets, and in response to inbound inquiries, we have engaged an industry-leading firm to advise us on potential alternatives and strategies that will have the potential to unlock shareholder value." The press release was materially misleading by omitting to state that Hansen had previously disclosed to MabVax's Board the disappointing Clinical Trial results, and that

Hansen had presented the Board a plan to divest MabVax of all of its assets and leave it as an empty corporate shell by the end of 2017.

134. In reliance upon Defendants' misrepresentations and omissions, Plaintiffs made further investments in MabVax during September and October 2017 pursuant to (i) an S-3 signed by both Defendants in California which MabVax filed, from California, on July 14, 2017 (the "July 14, 2017 S-3"), and (ii) publicly filed prospectus supplements, which Defendants, in California, caused MabVax to file from California on September 13, 2017 (the "September 13, 2017 Prospectus Supplement") and October 11, 2017 (the "October 11, 2017 Prospectus Supplement"). The S-3 and prospectus supplements incorporated certain publicly filed documents by reference.[6]

135. The July 14, 2017, S-3, September 13, 2017, Prospectus Supplement and October 11, 2017 Prospectus Supplement omitted material information that caused the Plaintiffs to invest. Had MabVax and Defendants not materially omitted that information, Plaintiffs would not have invested.

102. Later, in an August 8, 2017 Letter Agreement that Defendants intended Plaintiffs would be made aware of and that Defendants intended they and rely upon between MabVax and HS Contrarian Investments, LLC ("HSCI"), Defendants caused MabVax to agree that the employment terms of all management including Defendants would be reduced from three years to two years and that they would defer material portions of their salaries for the remainder of the year in consideration for yet another capital raise:

The employment terms of all management shall be reduced to two years from three years. Management shall defer portions of their salary for the remainder of the year, which shall be paid upon the earlier of completion of the $8,000,000

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page - of 42

Financing or a business transaction that represents, or transactions in the aggregate that represent, in excess of $10,000,000.

103. In August, September, and October of 2017, based on that Letter Agreement and in reliance of Defendants' promises to reduce the length of employment and defer material portions of their salaries136. In reliance upon Defendants' false and misleading statements identified in this section, Grander Holdings 401K and M. Brauser made the following purchasesadditional investments in MabVax:

of Common Stock:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $250,000 | 8/21/2017 |
| M. Brauser | $250,000 | 9/14/2017 |
| M. Brauser | $249,700 | 9/22/2017 |
| M. Brauser | $200,000 | 10/10/2017 |

137. Had Defendants not misrepresented and omitted material information, they would not have made those investments.

[*] All three filings expressly incorporated by reference MabVax's 2016 Annual Report on Form 10-K and Q1 2017 Form 10-Q, including the false statements contained in those documents.

104. Given the excessive nature of Defendants' salaries and the drag that such salaries were proving to be on MabVax's continued financial viability, the promises contained in the August 8, 2027, Letter Agreement were material to whether Plaintiffs would make further investments in MabVax, and if so, upon what terms.

105. Even though MabVax received the funding contemplated in the Letter Agreement, upon information and belief, Defendants forced MabVax to breach those promises as they never reduced their management term length or deferred portions of their salaries. According to the April 2, 2018 10-K, Defendants' salaries were nearly identical to those

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

*7. Defendants' Material Misleading or False Statements and Omissions from October 12, 2017, through February 6, 2018.*

138. On October 31, 2017, Defendants, from and in California, caused MabVax from California to issue a press release from California providing an "Update on the MVT-5873 Phase 1 Clinical Program." The press release described the status of the Phase 1b Combination Trial as

presented in the July 3, 2017 8-K. In the July 3, 2017 8-K Hansen's base salary was set at

$430,000. According to the April 2, 2018 10-K, he received $427,876 in fiscal year 2017, with

$448,5000 RSUs, $1,252,905 options, and $36,634 of "Other Compensation". In the July 3, 2017

8-K, Hanson's base salary was set at $310,000. According to the April 2, 2018 10-K, Hanson

received $309,312, with $277,016 RSUs, $224,945 options and $36,928 in "Other

Compensation."follows:

106. Defendants – with full control of MabVax – forced MabVax to breach the terms

of the August 8, 2017, Letter Agreement as part of their scheme to continue extracting as much

compensation and other benefits as possible from their roles as executives of MabVax.

MVT-5873 in combination with nab-paclitaxel and gemcitabine as first line therapy – The Company reported that newly diagnosed pancreatic cancer patients participating in the Phase 1 clinical trial of MVT-5873, when given in combination with first line nabpaclitaxel and gemcitabine, demonstrated reductions in tumor size after the first two months of therapy. The data reported from this dose escalation safety study included safety data from 7 patients at 1 mg/kg and 0.125 mg/kg. After the first cohort was treated at 1 mg/kg, the MVT-5873 dose was reduced to 0.125 mg/kg in combination with nab-paclitaxel and gemcitabine as the lower dose appears to be generally well tolerated.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

139. Plaintiffs are informed and believe that this release was the first time that MabVax or Defendants disclosed to investors that the dosage level for patients in the Phase 1b Combination Trial was lowered from 1.0 mg per kg to 0.125 mg per kg, despite the fact that the change to a lower dosage had occurred starting ten months earlier, in January 2017.

140. The October 31, 2017, press release was materially false and misleading, in at least three ways: (1) The treatment was not "generally well tolerated" by patients in the Phase 1b Combination Trial; for the reasons set forth above; (2) It omitted to state that the dosage of antibody administered to patients in the Phase 1b Combination Trial had to be lowered by a factor of eight specifically because of the large number of persistent Severe Adverse Events suffered by the first cohort of three patients; and (3) It omitted to state that even after reduction of dose, two of the first three patients who received the reduced dose suffered from Grade 3 ~~107. The foregoing makes it clear that when Defendants~~pneumonitis, the specific condition that ~~eventually~~ caused MabVax to ~~make~~ultimately shut down the

trial entirely when the it surfaced in additional patients.

~~representations in the Letter Agreement; that they did not at that time intend to cause MabVax to~~

~~abide by same.~~

~~108. Had Defendants not misrepresented what is alleged to have been misrepresented~~

~~in the Letter Agreement, Plaintiffs would not further investments in MabVax in August,~~

~~September, or October 2017 as the continued payment of excessive compensation packages~~

~~negatively affected the value of the MabVax securities they purchased.~~

~~109. Defendants' material misstatements concerning their promise to reduce their~~

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

compensation at a time when MabVax was starved for cash directly, causally, and foreseeably

related to MabVax's bankruptcy and Plaintiffs' loss.

G.   Defendants   Made   Material   Misrepresentations   and   Omissions   Concerning Progress of MabVax's Phase 1 HUMab-5B Antibody Trials to Continue Paying Their Own Exorbitant Salaries

132. MabVax and Defendants also made material misrepresentations and omissions

regarding the progress of MabVax's Phase 1 HuMab-5B Antibody trials.

133.  Upon information and belief, on or about February 12, 2018, MabVax suspended

patient enrollment in its Phase 1 HuMab-5B Antibody trials due to an "adverse event" involving a trial participant. Defendants were both personally informed by other MabVax executives or the clinicians conducting and overseeing the trials that patient enrolment was being suspended.

134. MabVax and Defendants, however, did not timely disclose this "adverse event;" and they likewise did not timely disclose that MabVax had suspended enrollment in its Phase 1 trials while soliciting yet even more funds from Plaintiffs.

135. In fact, MabVax's and Defendants' first public acknowledgment that anything was wrong with their Phase 1 trials whatsoever appeared in MabVax's Form 10-Q that Defendants both signed for the first quarter of 2018—which Defendants did not file until October 15, 2018, and after they received more than $700,000 from Plaintiffs while intentionally concealing this material fact.

136. MabVax and Defendants only then acknowledged the following:

On February 12, 2018, we reported on interim results of the current cohort of the Phase 1 study, in which MVT-5873 was given in combination with nab-paclitaxel and gemcitabine to patients newly diagnosed with CA19-9 positive pancreatic cancer. MVT-5873 at a dose of 0.125 mg/kg when added to first-line chemotherapy was generally well tolerated by all subjects. At that time, all six patients in the current cohort demonstrated measurable tumor reductions, with four patients meeting the criteria for partial response (PR) and two patients meeting the criteria for stable disease (SD). We believe these results further confirm results reported on a portion of the cohort in late 2017. Patient CA19-9 levels, which are a prognostic indicator of the disease state, were markedly reduced in all subjects with this combination therapy. *Due to adverse events potentially related to the combination of nab-paclitaxel, gemcitabine and MT/7"-5873, not seen in the monotherapy clinical study, the Company has suspended patient enrollment at the current dose.* We are evaluating plans to enroll additional patients at a lower dose to further explore safety and response in a larger population. (emphasis added)

137. Despite the suspension of enrollment in their Phase 1 trials in February 2018 (if not earlier), Defendants knowingly continued to paint a misleadingly rosy picture of the progress of the trials in press releases upon which Defendants knew that investors (including Plaintiffs)

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page - of 42

141. On November 7, 2017, Defendants, from and in California, caused MabVax from California to file a Quarterly Report on Form 10-K for the quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q"). That Form 10-K was signed by both Defendants Hansen and Hanson in California. Both Defendants Hansen and Hanson signed and filed with the SEC separate certifications pursuant to Section 302 of the Sarbanes-Exley Act of 2002 attesting that they each had (a) reviewed the report, and (b) based on their respective knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

142. In reliance upon Defendants' false and misleading statements identified above, Plaintiffs made the following additional investments in MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $250,000 | 2/6/2018 |
| Brauser Family Trust | $75,000 | 2/6/2018 |
| B. Brauser J. Brauser | $50,000 | 2/6/2018 |
| D. Brauser | $50,000 | 2/6/2018 |
| G. Brauser | $50,000 | 2/6/2018 |
| J. Brauser | $50,000 | 2/6/2018 |

143. Had Defendants not misrepresented and omitted material information, they would would rely not have made those investments.

*8. Defendants' Specific Material Misleading or False Statements and Omissions After February 6, 2018.*

138. For example, on 144. On February 6, 2018, MabVax and Defendants issued a press release, from and in California, Caused MabVax to file

from California a Current Report on Form 8-K, which attached a press release announcing a

announcing a private placement securities offering. This press release quoted Hansen as stating, "Our clinical

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

"Our clinical trial of MVT-5873 [HuMab-5B1] in combination with chemotherapy has continued to yield

to yield encouraging results. . . . Therefore, we intend to allocate a portion of the funds raised to continue

continue patient enrollment at the current treatment level to continue to confirm results seen to

date." These statements materially false and misleading because the safety results were anything

but "encouraging." Hansen knew at that time that five of the first six patients in the Combination

Trial had encountered at least one Severe or Life-Threatening Adverse Event, necessitating

cessation of treatment, by early June 2017. Second, Hansen also knew that the dosage of

antibody administered to patients in the Combination Trial had to be lowered by a factor of eight

due to the large number of persistent Adverse Events suffered by the first three-patient testing

sample. Third, Hansen also that even after reduction of dose, two of the first three patients who

received the reduced dose suffered from Grade 3 pneumonitis, which, as set forth above, is the

specific condition that caused MabVax to suspend the trial when the condition presented in

additional patients.


date." MabVax and Defendants knowingly and intentionally omitted from this press release the

material information that due to an "adverse event," enrollment in these clinical trials had been

suspended.

145. On information and belief, in late 2017 MabVax enrolled an additional cohort of three

patients into the Combination Trial, bringing the total number of patients in the Combination

Trial to nine. On further information and belief, these additional three patients received doses of

antibody at the level of 0.125 mg/kg, bringing the number of patients in the Combination Trial

who had received doses at the 0.125 mg/kg level to six.

146. On February 12, 2018, Defendants, in California, caused MabVax, from California, to file

with the SEC a Current Report on Form 8-K, which attached a press release with a headline that

trumpeted "MabVax Therapeutics Announces Positive Interim Data from Expanded Cohort in

Phase 1 Trial Evaluating MVT-5873 in Combination with First-Line Chemotherapy in Pancreatic

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Cancer." The press release described six patients who had been administered the Combination

Trial at the lower dose level of 0.125 mg per kg, and claimed that

the treatment "was generally well tolerated by all subjects," and that the "promising early results merit additional enrollment."

147. These statements were materially false and misleading, because three of those six patients developed Grade 3 or Grade 4 pneumonitis, the specific condition that caused MabVax to shut down the trial entirely when the condition surfaced in additional patients.

148. MabVax's former Vice President of Pharmaceutical Development, Paul Maffuid, has testified under oath that the third incidence of pneumonitis was sufficiently "serious" in nature, that MabVax had to notify the Food and Drug Administration, and revise its enrollment bulletin for patients. A "Serious" Adverse Event under the FDA guidelines, is not measured under the five-grade CTCAE criteria (first referenced in paragraph 8, *supra*), Rather, a "Serious" Adverse Event under the FDA guidelines is even more significant than a Grade 3 (Severe) Adverse Event under the CTCAE criteria. Specifically, Serious Adverse Events as defined by the FDA guidelines include those that result in death, require either inpatient hospitalization or the prolongation of hospitalization, are life-threatening, result in a persistent or significant disability/incapacity or result in a congenital anomaly/birth defect.

149. All of those facts were omitted from the February 12, 2018 Form 8-K filing and press release, which instead stated that the data generated to date was "Positive" and that the Combination Trial treatment was "generally well tolerated by all subjects." In truth, on information and belief, three of the first six patients treated at the lowered, 0.125 mg/kg dose, suffered Grade 3 or worse pneumonitis.

139150. On or about April 2, 2018, MabVax and Defendants issued, in California, caused MabVax, from California, to file with the SEC a Current Report on Form 8-K that attached a press release reporting operational and financial results. This press release quoted Defendant Hansen as stating, "

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

"We have made notable progress with our MVT-5873 [HuMab-5B1] and MVT-1075 clinical

programs and are very encouraged with the positive data we have seen to date. We look forward
to continuing

to continuing enrollment in each program and participating in key scientific conferences over
the course of

course of 2018[:.]" MabVax and Defendants omitted from this press release the material
information of"

which they were aware that due to an "adverse event," enrollment in these clinical trials had been

151. The April 2, 2018 press release was materially false and misleading because it

omitted to disclose that the majority of patients in the Phase 1b Combination Trial had suffered

Severe or Life Threatening Adverse Events. This included three patients who had developed

Grade 3 or Grade 4 pneumonitis, the specific condition that eventually caused MabVax to shut

suspendeddown the trial.

140152. On or about May 3, 2018, MabVax and Defendants issued yet another press
release quoting, in California, caused MabVax, from

California, to file with the SEC a Current Report on Form 8-K that attached a press
release

announcing a private placement securities offering. This press release quoted Defendant Hansen

Hansen as stating:

MabVax intends to use the net proceeds of the offering to fund continuing clinical
developments of hitsits HuMab 5B1 antibody designated MVT-5873 in combination
with gemcitabine and nab-paclitaxalnab-paclitaxal in first line therapy for the treatment
of patients newly diagnosed with pancreatic cancer. The Company has treated two
cohorts of patients for a total of six patients to date in this study; and these funds will
enable the Company to continue enrolling up to approximately 10 additional patients
with the objective of confirming early observations.

153. The May 3, 2018 press release was materially false and misleading because it

omitted to disclose that the majority of patients in the Phase 1b Combination Trial had suffered

Severe or Life Threatening Adverse Events. This included three patients who had developed

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Grade 3 or Grade 4 pneumonitis, the specific condition that eventually caused MabVax to shut down the trial.

154. In reliance upon Defendants' false and misleading statements identified above,

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Plaintiffs made the following additional investments in MabVax:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $100,000 | 5/11/2018 |
| B. Brauser | $20,000 | 5/11/2018 |
| D. Brauser | $20,000 | 5/11/2018 |
| G. Brauser | $20,000 | 5/11/2018 |
| J. Brauser | $20,000 | 5/11/2018 |
| Total | $180,000 | |

155. Plaintiffs are informed and believed that at some point in 2018, a fourth participant in the Phase 1b Combination Therapy portion of the Clinical Trial developed pneumonitis. At that point, MabVax's team, including Hansen, determined that the Clinical Trial needed to be shut down to protect patients. Any ongoing treatment of patients was halted, and enrollment of additional patients was indefinitely suspended.

156. Defendants were both personally informed by other MabVax employees or the clinicians conducting and overseeing the trials that patient enrollment in the trial was being suspended; but neither MabVax nor Defendants timely disclosed that salient fact.

157. MabVax's and Defendants' did not publically acknowledge that anything problematic concerning the continued viability of the Clinical Trial until the October 15, 2018, in MabVax's Form 10-Q for the first quarter of 2018, which was signed by both Defendants and which was filed extremely late. There, MabVax and Defendants acknowledged the following:

On February 12, 2018, we reported on interim results of the current cohort of the Phase 1 study, in which MVT-5873 was given in combination with nab-paclitaxel and gemcitabine to patients newly diagnosed with CA19-9 positive pancreatic cancer. MVT-5873 at a dose of 0.125 mg/kg when added to first-line chemotherapy was generally well tolerated by all subjects. At that time, all six patients in the current cohort demonstrated measurable tumor reductions, with four patients meeting the criteria for partial response (PR) and two patients meeting the criteria for stable disease (SD). We believe these results further confirm results reported on a portion of the cohort in late 2017. Patient CA19-9 levels, which are a prognostic indicator of the disease state, were markedly reduced in all subjects with this combination therapy. Due to adverse events potentially related to the combination of nab-paclitaxel, gemcitabine and MVT-5873, not seen in the monotherapy clinical

s

tudy, the Company has suspended patient enrollment at the current dose. We are evaluating plans to enroll additional patients at a lower dose to further explore safety and response in a larger population.

~~142~~158. At no point before October 15, 2018, did MabVax ~~or~~and Defendants acknowledge

in an 8-K or otherwise that ~~an "adverse event" had occurred or that~~ patient enrollment had been suspended ~~despite having knowledge of same.~~due to the prevalence of many

Severe Adverse Events all while continually soliciting further investment from Plaintiffs.
~~143. Yet between February 6, 2018, and Mayl 1, 2018, MabVax and Defendants continued to~~

~~solicit Plaintiffs for additional investments and succeeded.~~

~~144. Plaintiffs believed based upon representations Defendants made to them as set forth above,~~

~~that their investments would be used to fund the Phase 1 trials. Instead, the investments were~~

~~necessarily used to fund Defendants' compensation because the Phase 1 trials had been~~

~~suspended.~~

~~145. Based upon these misrepresentations and omissions,~~159. All told, the Plaintiffs made the following ~~equity~~investments in MabVax~~:~~ in reliance on

Defendants' false and misleading statements identified above:

| Plaintiff/Investor | Amount | Date |
|---|---|---|
| Grander Holdings 401K | $1,000,000 | 8/17/2016 |
| Grander Holdings | $350,000 | 5/2/2017 |
| Grander Holdings 401K | $150,000 | 5/18/2017 |
| Grander Holdings 401K | $250,000 | 8/21/2017 |
| M. Brauser | $250,000 | 9/14/2017 |
| M. Brauser | $249,700 | 9/22/2017 |
| M. Brauser | $200,000 | 10/10/2017 |
| Grander Holdings 401K | $250,000 | 2/6/2018 |
| Brauser Family Trust | $75,000 | 2/6/2018 |
| B. Brauser | $50,000 | 2/6/2018 |
| D. Brauser | $50,000 | 2/6/2018 |
| G. Brauser | $50,000 | 2/6/2018 |
| J. Brauser | $50,000 | 2/6/2018 |
| Grander Holdings 401K | $100,000 | 5/11/2018 |
| B. Brauser | $20,000 | 5/11/2018 |
| D. Brauser | $20,000 | 5/11/2018 |
| G. Brauser | $20,000 | 5/11/2018 |
| J. Brauser | $20,000 | 5/11/2018 |
| **TOTAL** | **$3,154,700** | |

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page 6 of 42

160. Had Plaintiffs been made aware of the truth about MabVax's and Defendants'

146. Had Plaintiffs known the truth about MabVax's and Defendants' material misrepresentations and omissions in MabVax'sMabVax's SEC filings, they would never have made those investments in MabVax because the ultimate disclosure that MabVax suspended its patient

made those investments in MabVax. MabVax is now in bankruptcy, and its stock is worthless.

~~Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page of 42~~

~~enrollment due to "adverse events" negatively affected the value of the MabVax securities they~~

~~purchased once the market learned the truth because the materialization of the undisclosed risk~~

~~associated with same ultimately doomed MabVax.~~

~~147~~161. ~~MabVax~~MabVax's and Defendants~~'~~' material misrepresentations and omissions not only

induced Plaintiffs~~'~~ investments, but they also are directly~~, and~~ causally~~, and foreseeably~~ connected to Plaintiffs'

~~Plaintiffs'~~ losses. The fact that the ~~Phase 1 trial was not going well, as represented by Defendants,~~Clinical Trial had been plagued by a majority of patients suffering

~~but had in fact been suspended due to an adverse event directly and negatively affected~~

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page 6 of 42

~~Sever~~
~~e Adverse Events, the prevalence of which directly led to the suspension of the Clinical~~

~~Trial—in direct contravention of Defendants' many material misrepresentations and omissions~~

~~MabVax's~~ set forth above—directly and negatively affected MabVax's ability to continue soliciting the

funds in needed to continue as a going concern. This ultimately was the cause of ~~MabVax's~~ ~~bankruptcy and Plaintiffs' injury. Defendants'~~ MabVax's

bankruptcy and Plaintiffs' injury. MabVax's and Defendants' misstatements and omissions

~~misstatement and omissions~~ pertained to the very risk that was concealed by their misrepresentations and omissions—that

MabVax would fail. In other words, ~~MabVax's~~ MabVax's and Defendants' misstatements and omissions

concealed facts that negatively affected the value of Plaintiffs' investment because it was the

materialization of this undisclosed risk that ultimately doomed MabVax.

### ~~H. Defendants Strip MabVax of its Assets to Line Their Own Pockets and Leave MabVax's Shareholders Holding the Bag~~

~~148. By the end of 2018, the value of Plaintiffs investments into MabVax had been~~

~~reduced to essentially zero as a direct and proximate result of Defendants material misstatements~~

~~and omissions once the market learned the truth that, among other things, (a) there never was~~

~~positive interim data with regards the Phase 1 trials; (b) the Oxford had not expired in September~~

~~2016, but instead that the second $5,000,000 tranche had been rejected; (c) Defendants continued~~

~~to give themselves excessively generous compensation packages; and (d) MabVax had~~

~~suspended patient enrollment due to "adverse events."~~

~~149. Later that year, MabVax and Defendants yet again solicited Plaintiffs for even~~

more

money and engaged in a scheme to enrich themselves to Plaintiffs' detriment; but Plaintiffs refused to invest any further money into the company that Defendants had cratered.

150. On November 19, 2018, MabVax announced that it had agreed to a term sheet for apparently necessary financing from Triton Investors ("Triton"); and the company filed an S-1 registration statement for that financing with the SEC.

151. Rather than close that financing, however, Defendants pursued a different deal that would provide greater personal benefits to themselves.

152. On January 4, 2019, MabVax disclosed that it had entered into merger discussions with Oncotelic, Inc., a private cancer immunotherapy company.

153. At the same time, Defendants were secretly negotiating a deal with a third party, BioNTech AG ("BioNTech"), that offered to purchase MabVax's remaining assets, as well as hire Hansen and Hanson, as well as provide them with lucrative employment agreements.

154. Despite the availability of obtaining supposedly necessary operating capital from sources that may have ensured MabVax's continued viability after Plaintiffs and other stockholders refused to throw good money after bad, Defendants chose the option that benefited them personally.

155. On February 28, 2019, Defendants caused MabVax to secretly borrow money from BioNTech and thereafter enter into an Asset Purchase Agreement on March 20, 2019, whereby MabVax agreed to sell its assets.

156. The day after, Defendants placed Mabvax into a pre-packaged Chapter 11 bankruptcy.

157. The Asset Purchase Agreement was conditional upon Defendants receiving employment contracts with BioNTech.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

158. Rather than accept the financing Triton offered or pursue a merger with Oncotelic, Defendants purposefully pushed the company into bankruptcy while simultaneously enriching themselves as they had done throughout the whole time Defendants solicited Plaintiffs' investments.

159. All conditions precedent to the maintenance of this action have occurred, been waived, or have otherwise been fulfilled.

<u>COUNT I</u>

**Violations of Sections 25400(d) and 25500 of the California Corporations Code**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through ~~159~~161 above, and

further allege:

~~160~~162.      This claim is asserted against the Defendants on behalf of Plaintiffs, which

purchased MabVax securities throughout 2016, 2017, and 2018.

~~161~~163.      Defendants willfully carried out a plan, scheme, and course of conduct that

was intended to and did deceive Plaintiffs as investors in MabVax, as alleged herein.

~~162~~164. Defendants made or materially participated in the act of making statements that, at

the time and in the light of the circumstances under which they was made, were false and

misleading with respect to a material fact, or omitted to state material facts necessary in order to

make their statements, in the light of the circumstances under which they were made, not

misleading, with the purpose of inducing Plaintiffs to purchase MabVax securities that Defendants

were selling.

~~Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page of 42~~

~~163. Plaintiff's~~165. Plaintiffs allege this claim based on MabVax's and Defendants~~, materially misleading~~' materially

~~statements or omissions including that:~~

> ~~(a)    Mabvax had requested and Oxford had rejected MabVax's request for~~
>
> ~~an additional $5,000,000 based on MabVax's inability to show positive~~

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

interim data with regards to the Phase 1 trial discussed herein; and

misleading statements or omissions set forth in detail above including:

(a) Touting the efficacy of the HuMab-5B1/MVT-5873 antibody at dosage levels they knew were well above the Maximum Tolerable Dose;

(b) Failing to disclose the prevalence of Severe Adverse Events suffered by patients in the Clinical Trial, which surfaced as early as mid-2016, and consistently arose through 2017 and into 2018;

(c) Misrepresenting that the antibody treatment was "well tolerated" despite the fact that it caused a majority of patients to suffer Severe Adverse Events;

(d) Misrepresenting that the Clinical Trial had delivered "promising" results and were "positive;" and

(be) Omitting that patient enrollment in the Phase 1 trialClinical Trial had been suspended as a result of an "adverse event."due to the prevalence of Severe Adverse Events suffered by patients.

164166. All of these statements and omissions, and many other communications identified above, were made by Defendants in California, at the headquarters of MabVax.

165167. Defendants knew, or recklessly disregarded, that their misstatements and omissions were false and misleading when made. Such material misstatements and omissions were made knowingly or recklessly and for the purpose of and effect of concealing information from

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Plaintiffs to secure their investments. At the time MabVax and Defendants made the misstatements or omissions, they were aware of (or had access to) the facts regarding the Oxford Loan and Phase 1 that they misrepresented or omitted.

166168. Defendants, with the willful intent to defraud, intended that that their misstatements

and omissions had the unlawful purpose of inducing Plaintiffs into purchasing securities. The Defendants had actual knowledge that Plaintiffs would not invest if they were told the truth of any one of the above statements.

~~167~~169. The Defendants were the top officers and controlling persons of MabVax, and had direct involvement in its day-to-day operations. The material omissions from ~~MabVax's~~MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made verbal representations to the Plaintiffs as well.

~~168~~170. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint as all such facts were readily available to them. The

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Defendants' material misrepresentations and omissions were done knowingly and recklessly and for the purpose and effect of concealing information from the solicited investors in order to secure their investments.

169171. As a result of the dissemination of the materially false and misleading information
and failure to disclose material facts, as set forth above, and in reliance on that information, the Plaintiffs invested in Mabvax as alleged above. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been timely disclosed. Plaintiffs would not have purchased MabVax shares, including at the prices they paid, or at all, had they been aware of Defendants' fraudulent course of conduct. Further, Defendants' misstatements and omissions directly and proximately caused Plaintiffs' losses because the material misrepresentations and omissions were pertinent to circumstances that ultimately culminated to cause MabVax to enter bankruptcy after directly and

proxi

mately causing the value of Plaintiffs' investments to plummet and thereby damage

Plaintiffs.

170172. Defendants' misstatement and omissions pertained to the very risk that was

concealed by their misrepresentations and omissions. Defendants' misstatements and omissions

concealed facts that negatively affected the value of Plaintiffs' investment because it was the

materialization of this undisclosed risk that ultimately doomed MabVax.

171173. As a direct and proximate result of the wrongful conduct of the Defendants,

Plaintiffs suffered damages in connection with their investments, and their loss was directly and

proximately caused by Defendants' wrongful conduct.

## <u>COUNT II</u>
### Violations of Sections 25401, 25501, 25504, and 25504.1 of the
### California Corporations Code Based Upon MabVax's MabVax's Violations of Sections 25401 and
### 25501

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through 159161 above, and

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page of 42

further allege:

172174. This claim is asserted against the Defendants on behalf of Plaintiffs, which each

purchased MabVax securities throughout 2016, 2017, and 2018.

173175. It is based on MabVax's MabVax's and Defendants'" materially-misleading statements or

omissions set forth in detail above including that:

(c) Mabvax had requested and Oxford had rejected MabVax's request for an additional $5,000,000 based on MabVax's inability to show positive interim data with regards to the Phase 1 trial discussed herein; and

(a)    Touting the efficacy of the HuMab-5B1/MVT-5873 antibody at dosage levels they knew were well above the Maximum Tolerable Dose;

(b)    Failing to disclose the prevalence of Severe Adverse Events suffered by patients in the Clinical Trial, which surfaced as early as mid-2016, and consistently arose through 2017 and into 2018;

(c)    Misrepresenting that the antibody treatment was "well tolerated"

despite the fact that it caused a majority of patients to suffer Severe Adverse Events;

(d) Misrepresenting that the Clinical Trial had delivered "promising" results and were "positive;" and

(de) Omitting that patient enrollment in the ~~Phase 1 trial~~Clinical Trial had been suspended ~~as a result of an "adverse event."~~due to the prevalence of Severe Adverse Events suffered by patients.

~~174~~176. Each of the related misrepresentations and omissions were made by MabVax and Defendants in California at ~~MabVax's~~MabVax's headquarters.

~~175~~177. By virtue of their high-level positions within MabVax, participation in and awareness of ~~MabVax's~~MabVax's operations, direct involvement in the day-to-day operations of MabVax, and communications with ~~MabVax's~~MabVax's investors, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of MabVax, including the content and dissemination of the statements that Plaintiffs contend are false and misleading. Each of the Defendants had access to the ~~MabVax's~~MabVax's public filings and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected. For example, Hansen signed the January 30, 2018, Form 8-K in California. Hanson signed certain filings as well in California. The May 12, 2017 S1 and July 14, 2017 S-3, which were deficient and materially omitted information that caused Plaintiffs to invest, was signed by both Defendants in California.

176178. Both Defendants retained significant managerial power in MabVax. Defendants regularly

negotiated contracts with Plaintiffs on MabVax's MabVax's behalf, explained MabVax's MabVax's

corporate strategy to Plaintiffs, solicited investors on MabVax's MabVax's behalf, hired employees,

and discussed

poten

tial board members. In short, Defendants directly control MabVax and materially aided and assisted MabVax in the conduct that gives rise to every cause of action in the Complaint.

~~177. MabVax's~~179. MabVax's material misstatements and omissions constitute primary violations of Section 25401 of the California Corporations Code, establishing its liability under Section 25501, because MabVax—from and in California—sold and offered to sell securities to Plaintiffs by means of those material misrepresentations and omissions.

~~178~~180. Defendants are liable under Section 25504 of the California Corporations Code because MabVax is liable under Section 25501 for its violations of Section 25401 at a time when both Defendants controlled it. Moreover, Hansen was a principal executive officer and a director of MabVax; and both Defendants materially aided in ~~MabVax's~~MabVax's acts and transactions constituting violations of Section 25401.

~~179~~181. Defendants are also liable under Section 25504.1 of the California Corporations Code because MabVax is liable under Section 25501 as a result of its violations of Section 25401 and both Defendants materially assisted MabVax in those violations with the intent to deceive or defraud.

~~180~~182. Each of the Defendants had access to the ~~MabVax's~~MabVax's public filings and had the ability to prevent the issuance of the false statements and material omission or cause such misleading statements and omissions to be corrected.

~~181~~183. Hansen and Hanson signed the various SEC filings at issue containing material misrepresentations and omissions in California. MabVax issued the SEC filings at issue

_____

containing material and misrepresentations and omissions from its headquarters in California.

~~182~~184. Both Defendants retained significant managerial power in MabVax. Defendants regularly negotiated contracts with Plaintiffs on ~~MabVax's~~MabVax's behalf, explained ~~MabVax's~~ MabVax's

corporate strategy to Plaintiffs, solicited investors on ~~MabVax's~~MabVax's behalf, hired and fired employees, and discussed potential board members. In short, Defendants directly controlled MabVax and materially aided and assisted MabVax in the conduct that gives rise to this cause of action (and every cause of action in this Complaint).

~~183~~185. Defendants made untrue statements of material facts and omitted to state material facts that were necessary to make those statements, in the light of the circumstances under which the statements were made, not misleading. The material omissions from ~~MabVax's~~MabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made materially false verbal representations to the Plaintiffs as well.

~~1~~186. Defendants knew (or were reckless in disregarding) that at the time they were inducing Plaintiffs to invest in MabVax that they were making material misrepresentations and omitting material facts related to the Oxford Loan and Phase 1 that Plaintiffs were entitled to know, that they would want to know, and that would impact Plaintiffs'' decision to invest in MabVax. When they did so, Defendants were aware of (or had ready access to) the very facts that they misrepresented and misleadingly omitted.

~~184~~187. MabVax and Defendants intended that Plaintiffs would rely on Defendants'' material misrepresentations and omissions and invest in MabVax.

Case 1:20-cv-08618-AKH   Document 52   Filed 12/03/21   Page  of 42

~~185~~188. In reliance and as a result of the dissemination of the materially false and misleading

information and failure to disclose material facts, as set forth above, the Plaintiffs

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page 37 of 42

invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable. Further, Defendants' material misstatements and omissions directly caused Plaintiffs' loss.

186189. Defendants' misstatements and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

187190. As a direct and proximate result of the MabVax'sMabVax's and Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases or acquisition of MabVax stock.

## COUNT III⁴III⁷
### Fraudulent Inducement

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1through 1591 through 161 above, and further allege:

188191.      This claim is asserted against the Defendants on behalf of Plaintiffs, who both purchased MabVax securities throughout 2016, 2017, and 2018.

189192.      The Defendants made materially false representations to Plaintiffs. The Defendants were the top officers and controlling persons of MabVax, and had direct involvement in in its day-to-day operations. The material omissions from MabVax'sMabVax's public written and verbal solicitations that were made to Plaintiffs in connection with the investments was the collective

action of the Defendants. The Defendants were each involved in drafting, producing, reviewing,

Plaintiffs include the remaining causes of action despite the Court's dismissal of same for purposes of appeal.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

and/or disseminating the documents at issue in this action and made materially false verbal

representations to the Plaintiffs as well.

190193.    Defendants knew that at the time they were inducing Plaintiffs to
invest in

_____

[2] Plaintiffs include the remaining causes of action despite the Court's dismissal of same for purposes of appeal.

MabV

ax that they were omitting material facts that Plaintiffs were entitled to know, that they

would want to know, and that would impact Plaintiffs'' decision to invest in MabVax.

191194. Defendants intended that Plaintiffs would rely on Defendants''
material

misrepresentations and omissions and invest in MabVax.

192195. In reliance and as a result of the dissemination of the materially
false and

misleading information and failure to disclose material facts, as set forth above, the Plaintiffs

invested in the above investments. Plaintiffs would not have made their investments and suffered

the economic loss associated with making their investment into MabVax had the true

information been disclosed. Plaintiffs'' reliance upon these statements was reasonable.

193196. As a direct and proximate result of the wrongful conduct of the
Defendants,

Plaintiffs suffered damages in connection with their investments.

194197. Defendants'' misstatement and omissions pertained to the very risk
that was

concealed by their misrepresentations and omissions. Defendants'' misstatements and omissions

concealed facts that negatively affected the value of Plaintiffs'' investment because it was the

materialization of this undisclosed risk that ultimately doomed MabVax.

## COUNT IV
## Common Law Fraud

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through 159246 above,
and

further allege:

195198. This claim is asserted against the Defendants on behalf of Plaintiffs,
which

purchased MabVax securities throughout 2016, 2017, and 2018.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

196199. The Defendants made materially false representations to Plaintiffs. The

Defendants were top officers and controlling persons of MabVax, and had direct involvement in

its day-to-day operations. The material omissions from MabVax'sMabVax's public written and verbal

solici

tations that were made to Plaintiffs in connection with the investments was the collective action of the Defendants. The Defendants were each involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action and made materially false verbal representations to the Plaintiffs as well.

~~197~~200. Defendants knew that at the time they were inducing Plaintiffs to invest in MabVax that they were omitting material facts that Plaintiffs were entitled to know, that they would want to know, and that would impact Plaintiffs' decision to invest in MabVax.

~~198~~201. Defendants intended that Plaintiffs would rely on Defendants' material misrepresentations and omissions and invest in MabVax.

~~199~~202. In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

~~200~~203. As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

~~201~~204. Defendants' misstatement and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

202205. Defendants' material misstatements and omissions directly and proximately caused

Plaintiffs' economic loss. The very pieces of information that Defendants made misleading

statements about or omitted from Plaintiffs were the factors that caused the demise of

MabV

ax and the Plaintiffs to suffer losses.

## COUNT V
### Common Law Negligent Misrepresentation

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 through ~~159~~246 above, and

further allege:

~~203~~206. The relationship between Plaintiffs and Defendants constituted a special

relationship in which Plaintiffs reposed in Defendants deep trust, dependence, confidence,

counsel, and reliance such that a fiduciary relationship was established.

~~204~~207. Defendants knew that Plaintiffs would and did rely and depend on Defendants

representations and judgments with regard to the funds Plaintiffs invested in MabVax and, in so

doing, Defendants undertook Plaintiffs' trust and confidence and Defendants, by their words and

action, undertook and assumed a duty to advise, counsel and protect Plaintiffs.

~~205~~208. Plaintiffs at all times relied upon Defendants' representations, financial judgment

and decision-making with regard to MabVax and Plaintiffs' decision to invest in MabVax.

~~206~~209. Defendants were all aware of Plaintiffs' reliance, dependence upon, and trust of

them as principals of MabVax.

~~207~~210. The Defendants made materially false representations to Plaintiffs. The

Defendants were top officers and controlling persons of MabVax, and had direct involvement in

its day-to-day operations. The material omissions from ~~MabVax's~~MabVax's public written and verbal

solicitations that were made to Plaintiffs in connection with the investments was the collective

action of the Defendants. The Defendants were each involved in drafting, producing, reviewing,

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

and/or disseminating the documents at issue in this action and made material verbal misrepresentations to the Plaintiffs as well.

208211. In reliance and as a result of the dissemination of the materially false and

misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above investments. Plaintiffs would not have made their investments and suffered the economic loss associated with making their investment into MabVax had the true information been disclosed. Plaintiffs' reliance upon these statements was reasonable.

~~209~~212. As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiffs suffered damages in connection with their investments.

~~210~~213. Defendants' material misstatements and omissions directly and proximately caused Plaintiffs' economic loss. The very pieces of information that Defendants made misleading statements about or omitted from Plaintiffs were the factors that caused the demise of MabVax and the Plaintiffs to suffer losses.

~~211~~214. Defendants' misstatement and omissions pertained to the very risk that was concealed by their misrepresentations and omissions. In other words, Defendants' misstatements and omissions concealed facts that negatively affected the value of Plaintiffs' investment because it was the materialization of this undisclosed risk that ultimately doomed MabVax.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues so triable.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief and judgment:

(a) An award of monetary damages against Defendants, jointly and severally, in an amount according to proof at trial, together with interest thereon;

~~Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42~~

(b) Costs of suit, including but not limited to Plaintiffs' attorneys' fees and expert fees; and

(c) Such other and further relief as the Court deems just and proper.

~~Respectfully submitted,~~

~~**CINQUE & CINQUE, P.C.**~~
~~*Attorneys for Plaintiffs*~~

~~355 Lexington Avenue~~
~~8th Floor~~
~~New York, NY 10017~~
~~Tel (212) 759-5515~~

~~By: *James  Cinque*~~
~~Bar Number: 1367168~~
~~Cinque845@aol.com~~

~~**DIFALCO FERNANDEZ & KAPLAN** *Attorneys for Plaintiff*~~

~~777 Brickell Avenue~~
~~Suite 630~~
~~Miami, Florida 33131~~
~~Tel: (305) 569-9800~~
~~Fax: (866) 569-0666~~

~~By: */s/ Justin B. Kaplan* Fla. Bar No. 0033725~~
~~jkaplan@dfkfirm.com (Admitted pro hac vice)~~

Case 1:20-cv-08618-AKH Document 52 Filed 12/03/21 Page  of 42

Dated: ~~December 3, 2021 Miami, Florida~~May 25, 2022

Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH**
~~**NELSON MULLINS**~~
*Attorneys for Plaintiffs*
2 South Biscayne Blvd.
~~21S^t~~ 21st Floor
Miami, Florida 33131
~~Miami, Florida 33131~~
Tel: (305) 373-9436
~~Fax: (305) 373-9443~~
Fax: (305) 373-9443


By: */s/ Justin B. Kaplan*
Fla. Bar No. 0033725

*Justin.Kaplan@nelsonmullins.com*

*(Admitted pro hac vice)*

| Summary report: | |
| :---: | :---: |
| **Litera® Change-Pro for Word 10.14.0.46 Document comparison done on 5/25/2022 9:13:30 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** [DE 52] - Fifth Amended Complaint.pdf | |
| **Modified filename:** Proposed Sixth Amended Complaint Final.pdf | |
| **Changes:** | |
| Add | 776 |
| Delete | 700 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 10 |
| Table Delete | 3 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1489 |